United States v. Joseph L. Bruno

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued: June 17, 2011                                    Decided: November 16, 2011)

Docket No. 10-1885

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

JOSEPH L. BRUNO,

*Defendant-Appellant*.

Before:  B.D. PARKER and CHIN, *Circuit Judges*, and KORMAN, *District Court Judge*.[*]

_____

Appeal from a judgment of the United States District Court for the Northern District of New York (Sharpe, *J.*) convicting Defendant-Appellant of two counts of honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346.

VACATED and REMANDED.

_____

ABBE DAVID LOWELL (Paul M. Thompson, Jeffrey W. Mikoni, *on the brief*), McDermott Will & Emery LLP, Washington, D.C., *for Defendant-Appellant*.

---

[*] The Honorable Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

Elizabeth C. Coombe (William C. Pericak, Brenda K. Sannes, *on the brief*), Assistant United States Attorney for the Northern District of New York, *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany NY, *for Appellee*.

BARRINGTON D. PARKER, *Circuit Judge*:

Joseph L. Bruno, the defendant-appellant and former Majority Leader of the New York State Senate, appeals his conviction in the United States District Court for the Northern District of New York (Sharpe, *J.*) for honest services mail fraud. *See* 18 U.S.C. §§ 1341, 1346. The prosecution arose from Bruno's failure to disclose conflicts of interest arising from his receipt of substantial payments from individuals seeking to do business with the State. An eight-count Indictment alleged that Bruno devised "a scheme and artifice to defraud the State of New York and its citizens of the intangible right to his honest services by (a) contacting for personal compensation and enrichment, and (b) entering and attempting to enter into direct and indirect financial relationships with, persons or entities who were pursuing interests before the Legislature or state agencies, and by concealing, disguising, and failing to disclose the existence of such compensated contacts and financial relationships, and the resulting conflicts of interest."

Bruno moved before trial to dismiss the Indictment on the ground that the honest services statute was unconstitutionally vague as applied to cases charging only the nondisclosure of conflicts of interest. The district court denied the motion, and the case proceeded to trial. Following a month-long trial and seven days of deliberations, the jury convicted Bruno of two counts of honest services fraud (Counts Four and Eight), acquitted him of five counts (Counts One, Two, Five, Six, and Seven), and could not reach a verdict on one count (Count Three) as to

which the district court subsequently declared a mistrial. The district court sentenced Bruno principally to two years imprisonment. This appeal followed.

While Bruno's appeal was pending, the Supreme Court decided *United States v. Skilling*, 130 S. Ct. 2896 (2010), and held that 18 U.S.C. § 1346, the honest services statute, criminalizes only fraudulent schemes effectuated through bribes or kickbacks and does not criminalize mere failures to disclose conflicts of interest. *Id.* at 2933.

As the government acknowledges that the convictions under Counts Four and Eight must now be vacated, this appeal focuses on whether Bruno may be retried under the standard announced in *Skilling* on those Counts as well as on Count Three. At oral argument, the government conceded that at a retrial its evidence would be the same. Bruno asks that we analyze the sufficiency of the government's evidence in the first trial because, if the evidence were insufficient, double jeopardy would, Bruno contends, bar retrial on the counts in question. Although we hold that *Skilling* requires us to vacate the convictions on Counts Four and Eight, because our review of the record convinces us that the government adduced sufficient evidence under the *Skilling* standard, double jeopardy does not bar retrial on those two counts. We also hold that double jeopardy does not bar retrial on Count Three because, regardless of the sufficiency of the evidence, the Double Jeopardy Clause does not preclude a retrial on a charge that resulted in a hung jury. Accordingly, we vacate the counts of conviction and remand for further proceedings consistent with this opinion.

**BACKGROUND**

Viewed in a light most favorable to the government, its proof established as to Count Four that between March 2004 and December 2004, Bruno received approximately $200,000 in

3

consulting fees from two companies owned by an Albany business man, Jared E. Abbruzzese, and his business partner, Wayne Barr, Jr. As to Count Eight, the government's evidence established that Bruno received $40,000 from Abbruzzese in the form of a payment disguised as proceeds from the sale of a racehorse. The government's theory was that these payments were intended to influence Bruno in his official capacity.

Specifically, the government's proof established that Abbruzzese held an interest in Evident Technologies Inc., a nanotechnology company, and that he sought to be compensated by Evident to help it obtain State funding. By September 2002, Abbruzzese had successfully assisted Evident in obtaining $1.5 million in funding from the State of New York. Under the terms of a grant from the State, Evident was to receive three annual $500,000 installments. The timing of the installment payments was, however, controlled by Bruno as Senate Majority Leader. Immediately following the announcement of the Evident Grant, Bruno authorized the payment of $250,000, half the promised amount of the first annual installment.

As compensation for Abbruzzese's assistance, Evident issued a warrant to Niskayauna Development, LLC ("Niskayauna"), a company controlled by Abbruzzese, allowing it to purchase up to 85,423 shares of Evident common stock. Under the terms of the warrant, the shares would vest in three installments: the first upon the issuance of the warrant and the second and third when Evident received the two subsequent installments under the grant.

Although Evident was promised two additional annual installments, as of October 2003, Bruno had not authorized them. Abbruzzese arranged a meeting in December with Bruno's office to discuss the past due payments. Bruno did not attend but the Secretary to the Senate Finance Committee, who reported directly to Bruno, did and told Abbruzzese that he could not

4

tell him whether or not the money would be forthcoming. Subsequently, Evident's CEO, Clint Ballinger, placed frequent calls to the Secretary inquiring about Bruno's approval of the past due installments.

In early February 2004, returning from a trip with Abbruzzese, Bruno brought up the possibility of entering into a consulting agreement with Communication Technology Advisors LLC ("CTA") and Capital & Technology Advisors LLC ("C&TA"), two companies owned by Abbruzzese and Barr. Abbruzzese told Bruno that he would consider the idea. A few days later, Bruno called Abbruzzese and suggested that Abbruzzese pay him $30,000 a month for consulting services. After Abbruzzese rejected Bruno's initial offer, the parties agreed that Bruno would receive $20,000 a month—$10,000 a month for CTA and $10,000 a month for C&TA.

On February 12, 2004, five days after Bruno first suggested the consulting arrangement, Bruno directed the Secretary to "move the money" to Evident. The Secretary did so by executing a document called a "Senate Majority Initiative Form," which required Bruno's approval and which authorized an additional payment of $250,000. The following week, Bruno formally entered into Consulting Agreements with CTA and C&TA for the previously agreed payments. The Agreements vaguely provided that CTA and C&TA "shall enjoy [Bruno]'s consulting services with respect to appropriate matters which are mutually agreeable to [Bruno] and [the companies]." The Agreements also gave Bruno sole discretion to determine the schedule on which he would provide his services.

From March 2004 through December 2004, Bruno, through his consulting company Capital Business Consultants ("CBC"), received a total of $200,000 from CTA and C&TA.

Bruno's companies, including CBC, were run from his Senate office by his staff who, at Bruno's direction, performed the companies' administrative and bookkeeping work. In his 2004 annual statement of financial disclosures, Bruno stated that he was employed by CBC as a consultant and received fees for his consulting services.

At trial, the government undertook to prove that this arrangement was not for consulting services but was intended to conceal payments to Bruno for expediting his approval of the Evident grant installments. For example, the government's evidence showed that, against the advice of Francis Gluschowski, the Deputy Counsel to the Senate Majority, Bruno neither kept any records of the work he did for CTA and C&TA nor generated any written work product. Also, Bruno's Executive Assistant, Patricia Stackrow, could not identify any work Bruno did in return for the payments he received. Furthermore, Barr testified that he had no expectations regarding Bruno's role as a consultant and that he was not aware of any work Bruno may have done in return for the consulting payments. Although Abbruzzese admitted that he did not require or receive any written work product or time records from Bruno, he testified that Bruno helped him become a "better people person" and a better manager. He also testified that Bruno was "very powerful" and that when people saw him with Bruno it "would influence people in how they saw the company," partly because Bruno was the Senate Majority Leader.

In April 2004, about a month after receiving his first consulting payments from C&TA and CTA, Bruno recommended Barr's appointment to the New York Racing Association Board of Trustees ("NYRA Board" or "Board"). Governor Pataki ultimately accepted Bruno's recommendation and appointed Barr to the Board. That same month, Bruno, Abbruzzese, and

6

another individual, Jerry Bilinski, entered into a partnership to breed thoroughbred racehorses. The horses included two thoroughbred mares and their foals, one named Christy's Night Out.

Pursuant to the C&TA and CTA Agreements, Bruno's employment was set to expire in December 2004. In Bruno's termination letter, dated December 9, 2004, Barr thanked Bruno "[o]n behalf of C&TA and CTA . . . for [his] fine help with respect to various golf course opportunities in Florida, general telecommunications advice, and in particular, introduction to Lenny Fassler."

That same month, Abbruzzese, who served as chairman of the board of directors of a company known as Motient Corporation, directed Motient to hire CBC. Pursuant to an agreement dated December 20, 2004, Motient agreed to pay CBC $20,000 a month for "consulting services . . . including, without limitation, general advice with respect to the telecommunications regulatory environment, as well as telecommunications business opportunities that exist for Motient." The Motient Agreement commenced on January 1, 2005 and lasted through June 30, 2005.

In July 2005, immediately following the termination of the Motient Agreement, Barr, at the direction of Abbruzzese, sent an email to Rob Macklin, General Counsel of Motient and Secretary of TerreStar Networks Inc., another company controlled by Abbruzzese, noting that CBC's consulting work was more appropriate for TerreStar. At that point, Terrestar entered into an agreement with CBC. The terms of the Terrestar Agreement were similar to the terms of the CTA, C&TA, and Motient Agreements: Bruno was paid $20,000 per month for consulting services "with respect to appropriate matters which [were] mutually agreeable to [him] and

7

Terrestar" and Bruno was given "sole discretion to determine [his] own schedule in providing services to Terrestar."

Although the Terrestar Agreement was set to expire on December 31, 2005, Terrestar decided to terminate the Agreement in August because its new CEO had developed concerns as to whether Bruno was actually providing services to the company. Because of this early termination, Bruno did not receive $80,000 of anticipated income. Abbruzzese testified that in an effort to make good on the TerreStar contract, he committed to buy Bruno's one-third interest in Christy's Night Out for $80,000. Abbruzzese testified that although he did not believe the horse was worth that amount, he did not believe the horse was "worthless." The government, on the other hand, presented evidence that the horse was, at best, worth only a small fraction of that amount. Ultimately, Abbruzzese simply gave the horse away.

In 2005, Evident was required to seek new office space and the Senate Staff worked with Evident's CEO to find it. Their efforts were successful as a consequence of a $2.5 million grant from the State, personally sponsored and approved by Bruno, under which Evident was able to relocate to a building on the campus of Russell Sage College. The Russell Sage Grant was used to renovate an existing building to provide office space to Evident and two other companies. Because Abbruzzese "had assisted in the discussions with [] Bruno" regarding the Russell Sage Grant, Evident's Board of Directors voted to authorize the final third of Abbruzzese's warrant to vest on November 2, 2005. Although Abbruzzese's third warrant was not scheduled to vest until Evident received the last installment of the 2004 Evident Grant, Abbruzzese requested that the Russell Sage Grant count as vesting the final third of his warrant because he believed that "the State was not go[ing] to honor its full commitment."

Five days after Abbruzzese's warrant vested, Abbruzzese wrote Bruno a check for $40,000—half of the amount he originally promised to pay for Christy's Night Out. Although Abbruzzese still owed Bruno $40,000 for the horse, in an agreement dated March 1, 2006, Bruno forgave the debt in exchange for Abbruzzese's one-third interest in the six horses owned by the partnership. By all accounts this was a bad deal for Abbruzzese; two of the partnership's horses eventually sold for over $244,000 and the partnership owed (but never paid) Abbruzzese $44,219 for the sale of a colt in 2005. Abbruzzese testified that he "did poorly" in this transaction, but that the transaction allowed him to "ma[ke] good on the Terrestar contract [and] . . .ma[ke] good on getting out of all the horse dealings with Jerry Bilinski." According to Abbruzzese, he "made good on severing all [his] economic ties for $40,000." Bruno did not disclose the horse partnership or Abbruzzese's $40,000 payment in his annual statements of financial disclosure.

## DISCUSSION

On appeal, Bruno argues that we should: (1) vacate his conviction for honest services mail fraud in light of *Skilling*, (2) dismiss the Indictment because it does not charge a valid crime; (3) review the sufficiency of the evidence under *Skilling*'s new standard; and (4) enter a judgment of acquittal on Counts Three, Four, and Eight because under *Skilling* the evidence is insufficient to convict on those counts. We address each issue in turn.

I. **Whether the Conviction should be Vacated: *Skilling v. United States* and Bruno's Honest Services Fraud Conviction (Counts Four and Eight)**

A. *Skilling v. United States*

*Skilling* arose from the prosecution and conviction of Jeffrey Skilling, Enron's former Chief Executive Officer, for conspiracy to commit honest services wire fraud. 130 S. Ct. at

9

2907. The Court examined the scope of § 1346 and held that "[t]o preserve the statute without transgressing constitutional limitations," the honest services statute criminalizes only fraudulent schemes to deprive another individual of his honest services through bribes or kickbacks. *Id.* at 2928, 2931. The Court expressly rejected the government's argument that § 1346 also encompasses undisclosed self-dealing by a public official. Finding that the government did not allege that Skilling accepted bribes and/or kickbacks, the Court vacated his conviction. *Id.* at 2934-35.

### B. The Effect of *Skilling* on Bruno's Honest Services Conviction

Bruno argues, and the government concedes, that his honest services fraud conviction on Counts Four and Eight must be vacated because, in light of *Skilling,* the district court's charge incorrectly stated the law. After our review of the record, we agree. Pursuant to the law in effect at the time, the district court instructed the jury that "the indictment charges that Mr. Bruno committed honest services fraud by failing to disclose material conflicts of interest and related material information," and that "[a] conflict of interest exists when" the public's interest "in the proper administration of the official's office" and "the official's interest in his private economic affairs . . . clash or appear to clash." However, the district court did not require the jury to find that Bruno accepted bribes or kickbacks to be convicted of honest services fraud. In light of *Skilling*, this failure to limit honest services fraud to bribes and kickbacks was error. *See United States v. Riley*, 621 F.3d 312, 324 (3d Cir. 2010) (finding plain error "where the fraudulent act is the non-disclosure of a conflict of interest," and the jury was not instructed on the distinctions drawn by *Skilling*). Accordingly, we vacate Bruno's conviction on Counts Four and Eight.

10

**II.     Whether the Indictment should be Dismissed**

Bruno also argues that the Indictment should be dismissed "because the only charges made in the Indictment fail to charge a valid crime" under *Skilling*.  Pretrial, the government took the position that its thirty-five page Indictment did not charge a bribery or kickback theory of honest services fraud, but rather, a failure to disclose a material conflict of interest theory.  *See* JA 170-71.  On appeal, the government's position has shifted somewhat.  Now the government contends that the Indictment can be read as also charging Bruno with a bribery or kickback theory of honest services fraud and that, in any event, it is unnecessary for this Court to reach the issue of the sufficiency of the Indictment because the government, without broadening the charges, intends to seek a superseding indictment based on the same underlying evidence and alleging the same statutory violations.

We need not decide whether, as the government now contends, the Indictment can be read as also charging a bribery or kickback theory.  While the Indictment alleges sufficient facts to support a bribery charge, it does not explicitly charge a bribery or kickback theory, and does not contain language to the effect that Bruno received favors or gifts "in exchange for" or "in return for" official actions.  *See United States v. Bahel,* 2011 WL 5067095, at *19 (2d Cir. Oct. 26, 2011).  It would be preferable and fairer, of course, for the government to proceed on explicit rather than implicit charges, and as the government intends to seek a superseding indictment, we dismiss the Indictment, without prejudice.

**III.     Whether We Should Consider the Sufficiency of the Evidence**

Next, invoking double jeopardy principles, Bruno argues that, in addition to vacating his convictions and dismissing the Indictment, we should review the sufficiency of the evidence on

11

Counts Three, Four, and Eight under the standard set forth in *Skilling* to determine whether a retrial under a bribery or kickback theory would violate the Double Jeopardy Clause. Specifically, Bruno contends that because the government adduced insufficient evidence at his first trial to support a conviction under *Skilling*'s interpretation of § 1346 jeopardy terminated and he may not be retried.

### A. The Double Jeopardy Clause

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Under this Clause, after a defendant is placed in jeopardy for a specific offense, and jeopardy terminates with respect to that offense, the defendant may not be tried or punished a second time for the same offense. *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106 (2003).

As both parties agree, under most circumstances the Double Jeopardy Clause does not bar retrial of a defendant whose conviction is reversed because of an error in the trial proceedings. *See Burks v. United States*, 437 U.S. 1, 14-16 (1978); *see also United States v. Tateo*, 377 U.S. 463, 466 (1964). The principal exception to this rule is a reversal for insufficiency of the evidence. *See Burks*, 437 U.S. at 18. A reversal based on insufficiency of the evidence has the same effect as a not guilty verdict "because it means that no rational factfinder could have voted to convict the defendant." *Tibbs v. Florida*, 457 U.S. 31, 41 (1982).

Although the parties agree that a ruling that the evidence is insufficient to convict terminates jeopardy and bars a retrial, the parties disagree as to whether we should consider the sufficiency of the evidence (1) where a jury has hung on a particular count and (2) where a

12

conviction has been reversed due to a subsequent change in the law.  We address each issue in turn.

**B.      Hung Jury Count:  Count Three**

We first turn to Count Three, which relates to checks Vytek Wireless Inc., mailed to Bruno in 2003 and 2004 pursuant to a series of consulting agreements.  Because the jury failed to reach a verdict with respect to Count Three, the district court declared a mistrial as to that Count.  Bruno contends that we should review the sufficiency of the evidence of Count Three even though the jury failed to reach a verdict.  We disagree.

The law is well settled that where a court declares a mistrial because of the failure of a jury to reach a verdict, there is no double jeopardy bar to retrial of the defendant on that count.  *See Richardson v. United States*, 468 U.S. 317, 326 (1984); *see also United States v. Ustica*, 847 F.2d 42, 48 (2d Cir. 1988) (citing cases).  This is because the government, like the defendant, is entitled to resolution of the case by a verdict from the jury.  "The interest in giving the prosecution one complete opportunity to convict those who violated its laws justifies treating the jury's inability to reach a verdict as a nonevent that does not bar retrial."  *Yeager v. United States*, 129 S. Ct. 2360, 2366 (2009) (internal quotation marks omitted).

This analysis does not change even if the prosecution's evidence was insufficient to support a conviction.  *See Richardson*, 468 U.S. at 326 ("Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial.").  Because the government would not be barred on double jeopardy grounds from retrying Bruno

on Count Three if the evidence presented at trial was insufficient to sustain a conviction, we are not required to engage in a sufficiency of the evidence analysis as to that Count.[2]

## C.    Counts of Conviction:  Counts Four and Eight

Next, we turn to the counts of conviction—Counts Four and Eight.  Although we have already determined that the conviction must be vacated, Bruno argues that we must also review the sufficiency of the evidence to sustain a conviction under the standard set forth in *Skilling* in order to determine whether he can be retried.  The government, in turn, argues that a sufficiency analysis is not appropriate where, as here, the law changes after conviction.

Bruno does not contend that there was insufficient evidence to convict him of honest services fraud under the erroneous charge given to the jury.  Nor does he contend that the only error was the improper jury charge.  Instead, Bruno asserts that the case against him—from its inception up to his conviction—was built around a theory of honest services fraud invalidated by *Skilling*.  Thus, Bruno argues, he is entitled to a judgment of acquittal if there is insufficient evidence in the record of the first trial to support a conviction under a bribery or kickback theory of honest services fraud subsequently required by *Skilling*, even though the theory was not asserted in the Indictment or charged to the jury.

This distinction is important because although we have previously held that sufficiency of the evidence review is appropriate when a conviction has been reversed for trial error, *see,*

---

[2] There may be circumstances where acquittal on some counts can preclude retrial on other counts on which the same jury hangs.  *See Yeager*, 129 S. Ct. at 2370.  However, Bruno does not make this argument on appeal.  Any future arguments regarding issue preclusion or other potential bars to reprosecution must necessarily be resolved as they arise if the government decides to file a superceding indictment.  Today we decide that the hung count, standing alone, does not shield Bruno from reprosecution on Count Three.

*e.g., United States v. Ford*, 435 F.3d 204 (2d Cir. 2006); *United States v. Wallach*, 979 F.2d 912 (2d Cir. 1992), we have not previously considered whether such review is appropriate where, as here, the error is due to an intervening change in the law. In *Ford*, we stated that sufficiency review was necessary "in order to determine whether a retrial is permissible" where there was an error in the judge's jury instructions. 435 F.3d at 214. Similarly, in *Wallach*, after reversing a conviction because of prosecutorial misconduct, we observed that "reversal of a conviction on grounds other than sufficiency does not avoid the need to determine the sufficiency of the evidence before a retrial may occur." 979 F.2d at 917. However, unlike this case, in *Ford* and *Wallach* the government was on notice regarding the elements of the crime it needed to prove to obtain a conviction and those elements were not later altered by a change in the applicable law. In those circumstances, we concluded that it was reasonable to assess the sufficiency of the evidence because the error occurred after the government had an opportunity to present the evidence it needed to satisfy the correct standard.

The government, relying on out of Circuit authority, urges us not to conduct a sufficiency review because, although such a review is not prohibited, it would be unfair to conduct one against a standard that did not exist at the time of the trial. The government urges that in change of law cases the appropriate remedy is to remand for a new trial because any insufficiency in the evidence "is not because of the government's failure of proof but because of the changes brought by [the new law]." *United States v. Ellyson*, 326 F.3d 522, 534 (4th Cir. 2003); *see also United States v. Robison*, 505 F.3d 1208, 1225 (11th Cir. 2007) (remanding for retrial because the district court's decision to "erroneously define[] [an element of the crime] and ma[k]e it clear to the parties far in advance of trial that it would continue to use its erroneous definition throughout

15

the case . . . deprived the government of any incentive to present evidence that might have cured any resulting insufficiency").[3] These courts reasoned that barring retrial because the government failed to proffer sufficient proof to satisfy a standard that did not exist at the time of conviction would be unfair to the government. Remanding for retrial, on the other hand, would allow the government the opportunity to muster evidence sufficient to satisfy the new standard.

Although we recognize that in some cases there may be sound reasons for refusing to consider the sufficiency of the evidence when there has been a subsequent change in the law, they do not apply here. At oral argument the government conceded that it would present no new evidence if Bruno were retried and that it presented at trial all its evidence regarding quid pro quo now required by *Skilling*. Thus, unlike the authority on which the government relies, this is not a case where considering the sufficiency of the evidence would deny the government an opportunity to present its evidence. The government's only argument against a sufficiency review is that, in the future, there may be other cases where prosecutors do not have the same incentive to present all of their evidence. We concern ourselves only with the issues on this appeal and leave other ones for another day. Accordingly, we accept Bruno's invitation to evaluate the sufficiency of the evidence.

---

[3] *See also United States v. Weems*, 49 F.3d 528, 531 (9th Cir. 1995) ("The government had no reason to introduce such evidence because, at the time of trial, under the law of our circuit, the government was not required to prove that a defendant knew that structuring was illegal"); *United States v. Wacker*, 72 F.3d 1453, 1465 (10th Cir. 1995) ("[T]he government here cannot be held responsible for 'failing to muster' evidence sufficient to satisfy a standard which did not exist at the time of trial."). *But see United States v. Miller*, 84 F.3d 1244, 1258 (10th Cir. 1996), *overruled on other grounds, United States v. Holland*, 116 F.3d 1353 (10th Cir. 1997) (stating that remand for retrial is proper "only if the jury could have returned a guilty verdict if properly instructed"); *United States v. Smith*, 82 F.3d 1564, 1567 (10th Cir. 1996) (conducting sufficiency of the evidence review and determining that evidence was insufficient to support conviction under proper standard).

## IV. Whether Double Jeopardy Protection Bars Retrial because of Insufficiency of the Evidence: Counts Four and Eight

Because of the intervening decision in *Skilling*, this case reaches us in a somewhat unusual procedural posture. We are required to view the evidence at the first trial as though Counts Four and Eight were pled in conformity with what *Skilling* now requires. In so doing, we still apply well settled principles. We review a challenge to the sufficiency of the evidence *de novo*. *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir. 1997). We credit every available inference in the government's favor and conclude that a retrial is not barred by the Double Jeopardy Clause if any rational trier of fact could have found Bruno guilty beyond a reasonable doubt under the bribery or kickback theory required by *Skilling*.

Bruno's sufficiency claim is limited in scope. Bruno argues that the government failed to provide sufficient proof of a quid pro quo, an essential element of a bribery theory of honest services fraud. *See United States v. Ganim*, 510 F.3d 134, 148-49 (2d Cir. 2007). We disagree. A quid pro quo is a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the course of the exercise of his official authority. *Id.* at 141. "This is especially true in cases involving governmental officials or political leaders, whose affairs tend more than most to be subjected to public scrutiny. As a result, a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt." *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988). Acts constituting the agreement need not be agreed to in advance. A promise "to perform such acts as the opportunities arise" is sufficient. *See Ganim*, 510 F.3d at 142. The key inquiry is whether, in light of all the evidence, an intent to give or receive something of value in exchange for an official act has been proved beyond a reasonable doubt.

17

We find that there is sufficient evidence in the record for a reasonable jury to find a quid pro quo under Count Four. The government's evidence would permit a reasonable jury to find that Bruno performed virtually non-existent consulting work for substantial payments. As detailed above, between March and November 2004, Bruno received $200,000 in consulting fees from CTA and C&TA, companies owned by Abbruzzese and Barr. Witnesses associated with Bruno and Abbruzzese, including Barr, could identify no work Bruno was doing to justify the consulting fees. Furthermore, the fact that, during his employment with CTA and C&TA, Bruno did not produce any written work product or keep any time records could be accepted by a rational jury as evidence that the payments were sham ones.

Second, a reasonable jury was entitled, although not required, to find that the government's evidence showed that Bruno attempted to cover up the extent of his relationship with Abbruzzese, including the exorbitant consulting fees that Bruno was receiving from his companies. Although the CTA and C&TA Agreements only named Bruno in his personal capacity, all the payments were made to CBC, Bruno's consulting company—an entity that used state employees and resources to function. Furthermore, when asked by Gluschowski whether Abbruzzese had any business before New York State, Bruno replied that he was not aware of any even though Bruno knew Abbruzzese was seeking funding on behalf of Evident. *See United States v. Urciuoli*, 613 F.3d 11, 14 & n.2 (1st Cir. 2010) (finding sufficient evidence to support bribery charge because, among other things, evidence showed that defendant "sought to hide the extent of [his company's] relationship with [a senator]" by hiding the fact that the senator had lobbied for the company and by covering up the compensation that the senator received from the company).

18

The government's evidence of the timing of the payments in relation to the actions taken by Bruno could also be accepted by a rational jury in support of the conclusion that Bruno understood that the consulting payments were made in return for official action. Prior to Bruno's suggestion that Abbruzzese hire him as a consultant, Abbruzzese had been trying unsuccessfully to convince Bruno to authorize further installments of the Evident Grant. Five days after Abbruzzese verbally agreed to pay Bruno $20,000 a month, Bruno authorized another $250,000 payment of the Evident Grant. Six days later, Bruno and Abbruzzese signed the formal Consulting Agreements for CTA and C&TA. A few months after that, Bruno appointed Barr, Abbruzzese's business partner, to the NYRA board. Although other inferences are certainly possible, our concern at this point is with those a jury was entitled to draw.

From this and other evidence, a rational jury could find that Abbruzzese's purpose in hiring Bruno as a consultant was for Bruno to use his office to further the interests of Abbruzzese and Evident. *See United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 162 (2d Cir. 2008) (stating that an agreement to pay a public official's associates "for work they did not perform . . . provided strong support for the jury's finding that [the payor] intended to influence an official act and to defraud the people of the State of Connecticut of their right to [the public official]'s honest services."). That jury could also conclude that Bruno used his official authority on behalf of Abbruzzese and Evident; and that the compensation Bruno received was for his exercise of that authority. *See United States v. Biaggi*, 909 F.2d 662, 684 (2d Cir. 1990) ("We have recognized, especially with respect to public officials, that evidence of the receipt of benefits followed by favorable treatment may suffice to establish circumstantially that the benefits were received for the purpose of being influenced in the future performance of

19

official duties, thereby satisfying the quid pro quo element of bribery"). As a result, a reasonable jury could conclude that Bruno deprived New York citizens of his honest services by accepting payments that were intended to and did influence his conduct as a public official.

There is also sufficient evidence of a quid pro quo for a reasonable jury to convict Bruno on Count Eight. Taking the evidence in the light most favorable to the government, a jury could find that Abbruzzese's $40,000 payment for Christy's Night Out was an illegitimate gift disguised as a horse payment. As detailed above, the government provided credible evidence that the horse was not worth anything like the $80,000 that Abbruzzese promised Bruno or the $40,000 that Abbruzzese ultimately paid. Given the illegitimacy and timing of the payment, Abbruzzese's efforts to disguise the payment, and Bruno's failure to disclose the transaction, a reasonable jury could find that Abbruzzese only made the payment to "make good" on the TerreStar Agreement that was prematurely terminated. A jury could also conclude that the arrangement was structured to pay for Bruno's continued assistance to Abbruzzese and Evident, such as the authorization of the Russell Sage Grant which provided Evident with much needed office space and indirectly benefitted Abbruzzese by allowing the third installment of his warrant to vest. As with Count Four, this evidence is enough for a reasonable jury to find that Bruno's actions deprived New York citizens of his honest services as a New York senator under the standard announced in *Skilling*. Accordingly, we hold that double jeopardy does not bar retrial because of insufficiency of the evidence on the counts of conviction.[4]

---

[4] We note that our holding only deals with whether the Double Jeopardy Clause bars retrial because of insufficiency of the evidence. As with Count Three, arguments regarding other potential bars to reprosecution are not before us. *See* note 2 *supra*.

20

**CONCLUSION**

For the foregoing reasons, Bruno's conviction is **VACATED** and the case is **REMANDED** for further proceedings consistent with this opinion.