11-5281-pr
Hoffler v. Bezio

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: December 5, 2012     Decided: August 8, 2013)

Docket No. 11-5281-pr

MICHAEL HOFFLER,

*Petitioner-Appellant*,

—v.—

NORMAN R. BEZIO, Superintendent of Great Meadow Correctional Facility, ERIC T. SCHNEIDERMAN, Attorney General of the State of New York,

*Respondents-Appellees*.

Before:

CABRANES, RAGGI, and CARNEY, *Circuit Judges*

On this appeal from a judgment entered in the United States District Court for the Northern District of New York (McAvoy, *J.*) denying a writ of habeas corpus sought pursuant to 28 U.S.C. § 2241, petitioner maintains that the State of New York cannot retry him for the murder of a prosecution witness in another case because (1) the evidence at his first trial was insufficient as a matter of law to support the jury's guilty verdict; (2) the Double Jeopardy Clause bars retrial in the face of such insufficiency; and (3) the failure of

1

the New York Appellate Division, Third Department, to address his sufficiency challenge before ordering retrial cannot be excused by its subsequent ruling that the error warranting retrial—a failure properly to swear the venire panel—meant that petitioner had never been placed in jeopardy at the initial trial. We conclude that a certificate of appealability is a jurisdictional prerequisite to a state prisoner's appeal of the denial of a § 2241 petition. Because that has not previously been clear in this circuit, we hereby grant petitioner such a certificate nunc pro tunc. On the merits of petitioner's appeal, we conclude that jeopardy did attach at petitioner's first trial, but that petitioner is not entitled to habeas relief because his sufficiency challenge is meritless, thereby rendering harmless any possible error in the state court's failure to address sufficiency when ordering retrial.

AFFIRMED.

———————————

RAY KELLY, ESQ., Albany, New York, *for Petitioner-Appellant*.

LISA ELLEN FLEISCHMANN, Assistant Attorney General, of Counsel (Barbara D. Underwood, Solicitor General, Roseann B. MacKechnie, Deputy Solicitor General for Criminal Matters, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, New York, New York, *for Respondents-Appellees*.

———————————

REENA RAGGI, *Circuit Judge*:

Petitioner Michael Hoffler appeals from a judgment entered on November 17, 2011, in the United States District Court for the Northern District of New York (Thomas J. McAvoy, *Judge*), denying him a writ of habeas corpus. See Hoffler v. Bezio, 831 F. Supp.

2d 570 (N.D.N.Y. 2011). Hoffler sought the writ pursuant to 28 U.S.C. § 2241 to prevent New York State from retrying him on murder charges arising out of the December 30, 2003 killing of Christopher Drabik, a prosecution witness scheduled to testify against Hoffler a few days later at a trial on drug charges.

Although a jury found Hoffler guilty of first-degree witness-elimination murder in violation of N.Y. Penal Law §§ 20.00 and 125.27(1)(a)(v), the New York Appellate Division, Third Department, reversed the conviction on direct appeal and remanded the case for a new trial because of a mistake in swearing the venire panel from which the trial jury was selected. Specifically, the oath administered to the venire panel was that prescribed by New York law for empaneled jurors rather than the oath prescribed for prospective jurors. See People v. Hoffler, 53 A.D.3d 116, 120–21, 860 N.Y.S.2d 266, 269–70 (3d Dep't 2008) (citing N.Y. Crim. Proc. Law § 270.15(1)(a)). Hoffler here asserts that New York cannot retry him for the Drabik murder because (1) the evidence at his first trial was insufficient as a matter of law to support the jury's guilty verdict; (2) the Double Jeopardy Clause bars retrial where the evidence at a first trial was legally insufficient to support conviction, see U.S. Const. amend. V; and (3) the Appellate Division's failure to rule on his sufficiency challenge before ordering retrial cannot be excused by its subsequent determination that the error in swearing the venire panel meant that petitioner had never been placed in jeopardy at his first trial, see Hoffler v. Jacon, 72 A.D.3d 1183, 897 N.Y.S.2d 755 (3d Dep't 2010).

3

At the outset, we conclude that our jurisdiction to hear an appeal brought by a state prisoner from the denial of a § 2241 petition requires the issuance of a certificate of appealability. Because our case law has not previously made that requirement clear, we excuse Hoffler's failure to seek a certificate within the time prescribed by our Local Rules, entertain his belated application, and grant him a certificate nunc pro tunc.

With our jurisdiction thus established, we conclude that Hoffler was placed in jeopardy at the initial Drabik murder trial because the empaneled jury was properly sworn to return a verdict based on impartial consideration of the evidence and the applicable law. No different conclusion is warranted by the fact that the venire panel was not sworn in accordance with New York law, because that error rendered the judgment of conviction voidable but not void.

Insofar as Hoffler faults the Appellate Division for not ruling on his sufficiency challenge before ordering retrial, we need not here decide whether such a ruling is constitutionally required by the Double Jeopardy Clause because, even if it is, any error in this case would be harmless beyond a reasonable doubt in light of record evidence sufficient to support a guilty verdict against Hoffler for first-degree witness-elimination murder.

Accordingly, we affirm the judgment of the district court denying Hoffler's § 2241 petition for a writ of habeas corpus to prevent New York State from retrying him for murder.

## I.     Background

### A.     The Murder of Christopher Drabik

After his own arrest on drug charges in April 2003, Christopher Drabik agreed to cooperate with Albany police in making controlled drug purchases from identified traffickers, including an individual known to Drabik by the street name, "Murder." Police subsequently identified "Murder" as petitioner Michael Hoffler who, based on a license he produced in the course of a traffic stop, also used the name "Ernest Hoffler." On May 1, 2003, and again on May 6, 2003, Drabik made controlled purchases of cocaine from Hoffler. Police recorded the men's initial telephone conversation leading to these transactions, and they videotaped their face-to-face drug transactions. On May 14, 2003, in the course of a third controlled drug purchase by a different cooperator, police arrested Hoffler.

At Hoffler's July 1, 2003 arraignment—at which he was released on bail—the prosecution revealed the dates, times, and locations of the charged drug sales. Subsequently, the prosecutor provided defense counsel with police reports detailing the transactions, and at a November 2003 pretrial hearing, a police detective testified as to the surrounding circumstances. On none of these occasions did authorities identify Drabik as an informant or explicitly reveal that he would be called as a prosecution witness at the trial scheduled to begin on January 5, 2004. Nor were Hoffler's recorded conversation and videotaped meetings with Drabik provided to defense counsel before Drabik's murder.

The week prior to trial, on December 30, 2003, Drabik was found shot dead in front of 478 Sixth Avenue in Troy, New York. Even without Drabik's testimony, a jury found Hoffler guilty on the pending drug charges, and the trial court sentenced him to an aggregate prison term of 17 to 34 years. See People v. Hoffler, 41 A.D.3d 891, 892, 837 N.Y.S.2d 750, 752 (3d Dep't 2007).

B.    Hoffler's Initial Conviction for Drabik's Murder

On March 19, 2004, a grand jury indicted Hoffler on homicide charges stemming from the Drabik murder. On May 19, 2005, the trial jury found Hoffler guilty of the most serious charge, first-degree witness-elimination murder, see N.Y. Penal Law §§ 20.00, 125.27(1)(a)(v), for which crime the court sentenced him to life imprisonment without parole.

The prosecution theory at trial, which it supported largely through circumstantial evidence, was that Hoffler murdered Drabik—with the assistance of Albany confederate Lance Booker and Brooklyn gunman Gregory Heckstall—by luring Drabik to 478 Sixth Avenue in Troy, New York where, early on the morning of December 30, 2003, Heckstall shot Drabik dead.[1] To facilitate our discussion of Hoffler's sufficiency claim, we summarize some of the pertinent evidence.

---

[1] Booker and Heckstall were tried separately and apart from Hoffler, with each convicted of two counts of first-degree murder and one count of conspiracy in the second degree. See People v. Booker, 53 A.D.3d 697, 698, 862 N.Y.S.2d 139, 140 (3d Dep't 2008) (affirming conviction); People v. Heckstall, 45 A.D.3d 907, 908, 845 N.Y.S.2d 488, 489 (3d Dep't 2007) (same).

6

Several witnesses placed Hoffler and an armed Heckstall together in Albany during the last week of December 2003. One such witness, who stated that Hoffler introduced Heckstall to her as his "cousin,"[2] reported seeing the two men on December 28, 2003, parked near her house in a gray SUV. That same day, an individual who identified himself as "Ernest Hoffler" had rented a gray Ford Escape SUV from Budget in Albany.

Another woman testified that she too had met Heckstall and Hoffler sometime during the last week in December when the two men were sitting with her neighbor, Booker, in a dark-colored SUV parked on her street. Heckstall spent the night with the woman and, when he undressed, she saw that he was carrying a firearm, which he indicated to her was loaded. Early the next morning, Hoffler arrived at the woman's home and spoke quietly with Heckstall, after which Heckstall quickly dressed, collected his gun, and left with Hoffler.

Telephone records showed that at 7:48 p.m. on December 29, 2003, a call was placed to Drabik's cell phone from a cell phone registered to Hoffler's residence and used by him on a regular basis. While it is not clear that this particular call connected, Drabik's parents recalled overhearing their son speaking on his cell phone sometime between 7:45 and 8:00 p.m. on December 29 to someone whom he agreed to meet the following day to discuss a possible construction job.

---

[2] Other evidence showed that the two men had been neighbors in Brooklyn some years earlier.

Telephone records showed that over the next several hours and into the early morning of December 30, there were frequent calls between Hoffler's cell phone and a phone number assigned to the residence of Pamela White, Booker's then girlfriend. In the early morning on December 30, Hoffler arrived at White's residence and waited while Booker dressed, after which the men left in a dark-colored SUV.

At about this same time, Drabik received a 6:09 a.m. call on his cell phone from an unidentified incoming number. His mother overheard Drabik agree to meet the caller in 20 minutes at 478 Sixth Avenue in Troy, New York, an address he wrote down on a piece of paper received into evidence at trial. A subsequent forensic examination of computers seized from Hoffler's home would show that, on the night of December 29, 2003, one computer accessed an online real estate listing for 478 Sixth Avenue in Troy.

At 6:37, 6:45, and 6:54 a.m. on December 30, Drabik called a number assigned to a "Trac Fone"—a prepaid phone with no named subscriber—that had been activated only the day before. Soon thereafter, at approximately 7:00 a.m., Drabik was fatally shot once in the chest in front of 478 Sixth Avenue in Troy, which is near the intersection of 112th Street and Sixth Avenue.

Andrew Bridgers testified that early on the morning of December 30, while delivering newspapers in Troy, he was slowing his car to a stop on Sixth Avenue near 112th Street when he spotted two men and heard a gunshot. Bridgers then saw one of the men fall to the ground while the other walked in the direction of Bridgers' vehicle, affording Bridgers a

8

view of the man's face.  Bridgers testified that the man who fell to the ground was Drabik;

the one who walked away was Heckstall.[3]

Mary Ann Fath, who lived on the corner of 113th Street and Sixth Avenue, a short

distance from the murder scene, testified that, early on the same morning, through the

window of her home, she saw an unfamiliar tan or "taupey"-colored SUV parked on 113th

---

[3] Because no hearsay objection was raised as to how Bridgers learned Heckstall's name, we view this evidence, like the rest of the record, in the light most favorable to the prosecution in assessing a sufficiency challenge.

Booker's role in the Drabik murder was less clearly established at Hoffler's trial than at his own.  As summarized by the Appellate Division in affirming Booker's conviction,

[I]n early December 2003, Hoffler showed [Booker Drabik's] driver's license, drove [Booker] to [Drabik's] house to show him where [Drabik] lived, and offered to pay [Booker] to kill [Drabik]. . . . When [Booker] failed to commit the crime, Hoffler enlisted Heckstall to kill [Drabik].  The day before the murder, Hoffler, after informing [Booker] that he needed a cellular "TRAC phone" to call [Drabik] without calls being traced back to him, was provided one by [Booker].  The evidence revealed that the TRAC phone was used to call [Drabik] and lure him to the site of the murder. . . . Later that evening, [Booker] received a phone call from Hoffler, who informed him that he had found a location to which he could lure [Drabik].

Between 5:30 and 6:00 a.m. the following morning, [Booker] received two telephone calls from Hoffler, who, accompanied by Heckstall, picked him up shortly thereafter in a rental car. . . . Hoffler, Heckstall and [Booker] then drove to [478 Sixth Avenue].  [Booker] recounted that, shortly after Heckstall got out of the car, he heard a gunshot and Heckstall ran back to the car and got in.  Hoffler immediately asked Heckstall if [Drabik] was dead and, after Heckstall responded that he had shot [Drabik] in the chest, Hoffler complained that Heckstall had not shot the victim in the head.

People v. Booker, 53 A.D.3d at 702–03, 862 N.Y.S.2d at 143–44.  To the extent this evidence was not received at Hoffler's trial, however, it plays no role in our resolution of this appeal.

9

Street with its headlights on. Soon after, she saw someone enter the SUV from a passenger side door, whereupon the vehicle pulled away.

Telephone records showed that between 7:19 and 7:45 on the morning of December 30, six telephone calls were placed between Hoffler's cell phone and a landline registered to his residence. Approximately three hours later, at 10:58 a.m., a New York City police officer wrote a ticket for a vehicle illegally parked in Brooklyn: the gray SUV rented from Budget under the name "Ernest Hoffler." Later that same day, the vehicle was back in Albany, where it was returned to Budget at 6:17 p.m., having been driven a total of 640 miles during "Ernest Hoffler's" three-day rental. On December 30, Budget debited $432.11 from Michael Hoffler's bank account to cover the cost of the rental, and subsequent forensic analysis would locate Hoffler's DNA in the rented SUV.

Meanwhile, when Heckstall arrived at his sister-in-law's Brooklyn home between 1:00 and 1:30 p.m. on December 30, he had several hundred dollars in cash.

C.     Post-Conviction State Court Proceedings

1.     Direct Appeal

In challenging his murder conviction on direct appeal, Hoffler argued that the trial evidence was insufficient to support his conviction and that the venire panel had not been sworn in accordance with New York law.

As to the latter point, New York law requires that two oaths be administered during the jury selection process. The first, administered to the venire panel before voir dire, is

10

intended to ensure that prospective jurors provide truthful answers to questions about their qualifications to serve. See N.Y. Crim. Proc. Law § 270.15(1)(a) (providing that venire panel "shall be immediately sworn to answer truthfully questions asked them relative to their qualifications to serve as jurors in the action"). The second oath, administered to persons selected to serve as trial jurors, is intended to ensure that these jurors will be impartial and that they will return a verdict based on the law and the evidence. See id. § 270.15(2) (stating that selected jurors "must be immediately sworn . . . to try the action in a just and impartial manner, to the best of their judgment, and to render a verdict according to the law and the evidence").

In Hoffler's case, the venire panel was mistakenly sworn in accordance with § 270.15(2), i.e. the trial oath, rather than § 270.15(1)(a), i.e. the voir dire oath. Thereafter, the trial jurors were again sworn in accordance with § 270.15(2). The Appellate Division concluded that the failure to administer the § 270.15(1)(a) oath to the venire panel was a fundamental error that "invalidated the entire trial," requiring reversal of Hoffler's conviction without regard to prejudice. People v. Hoffler, 53 A.D.3d at 124, 860 N.Y.S.2d at 272. In remanding the case for a new trial, the appeals court did not address Hoffler's sufficiency claim. See id.

2. State Proceedings Challenging Retrial

On remand, Hoffler moved the trial court to dismiss the indictment against him, arguing that, in the absence of an appellate determination that the evidence at the first trial

11

was sufficient to support conviction, he could not be retried without violating the Double Jeopardy Clause. The trial court denied the motion, concluding that the Appellate Division was not obliged by either state or federal law to review the sufficiency of the evidence in ordering retrial based on a trial error that did not implicate guilt or innocence. The trial court also declined to conduct its own assessment of sufficiency in the absence of any authority for it to do so on remand where the Appellate Division had not. The trial court nevertheless observed that it had already rejected Hoffler's sufficiency challenge when raised prior to the entry of the now reversed judgment of conviction.

Hoffler next attempted to prevent his retrial by pursuing his double jeopardy/sufficiency challenge in an Article 78 petition to the Third Department. See N.Y. C.P.L.R. 7801 et seq.[4] In denying relief, the Appellate Division concluded that, as a result of the failure to administer the proper oath to the jury, Hoffler was never placed in jeopardy at the Drabik murder trial. See Hoffler v. Jacon, 72 A.D.3d at 1185, 897 N.Y.S.2d at 757–58. The court explained its conclusion as follows:

> [U]nder New York's statutory double jeopardy scheme, a person is considered to have been "prosecuted" on an offense after the action proceeds to trial and the jury has been impaneled and sworn ([N.Y. Crim. Proc. Law § 40.30(1)(b)]). Thus, in a trial on an indictment, the constitutional protection against double jeopardy is not implicated—and jeopardy does not attach—in the absence of a duly impaneled and sworn jury. . . . [B]ecause it has been

---

[4] "In an Article 78 proceeding, New York state courts are empowered to issue common law writs of certiorari to review, mandamus, and prohibition." New York State Nat'l Org. for Women v. Pataki, 261 F.3d 156, 168 (2d Cir.2001) (internal quotation marks omitted).

12

established [in this case] that the jury was never properly sworn pursuant to [N.Y. Crim. Proc. Law §] 270.15(1)(a) and that such failure "invalidated the entire trial," the trial was a nullity and petitioner was never "prosecuted" under the indictment.

Id. at 1184–85, 897 N.Y.S.2d at 757–58 (citations omitted). In these circumstances, the state court concluded that it was not required to address Hoffler's sufficiency claim on direct appeal before ordering his retrial. See id. at 1185–86, 897 N.Y.S.2d at 758.

The New York Court of Appeals denied both Hoffler's application for leave to appeal, see Hoffler v. Jacon, 15 N.Y.3d 768, 906 N.Y.S.2d 812 (2010), and his subsequent motion for reconsideration, see Hoffler v. Jacon, 15 N.Y.3d 872, 912 N.Y.S.2d 561 (2010).

D.    Federal Habeas Petition

On April 11, 2011, Hoffler petitioned the district court pursuant to 28 U.S.C. § 2241 for a writ of habeas corpus. The district court denied the petition on November 17, 2011, observing that, in light of the Appellate Division's identification of an error that "invalidated the entire trial, it is patent that petitioner was never placed in jeopardy at his original trial," eliminating any double jeopardy concern with respect to retrial. Hoffler v. Bezio, 831 F. Supp. 2d at 579 (citation and internal quotation marks omitted).

Even if Hoffler had been placed in jeopardy at the Drabik murder trial, however, the district court identified a "sound reason" for the Appellate Division not to reach his sufficiency challenge. See id. at 578 n.6 (internal quotation marks omitted) (construing United States v. Bruno, 661 F.3d 733, 743 (2d Cir. 2011), to permit court ordering retrial not to consider sufficiency of the evidence where sound reason warranted). "Since the Appellate

13

Division determined that <u>no</u> trier of fact could properly consider the evidence offered at Hoffler's trial, any discussion regarding the evidence presented to that improperly empaneled body may well have been viewed by that court to be advisory in nature," and it is "well-settled that the giving of [advisory] opinions is not the exercise of the judicial function of New York appellate courts." <u>Id.</u> at 577 (alteration and emphasis in original; internal quotation marks omitted).

In any event, the district court concluded that any error in the Appellate Division's failure to rule on Hoffler's sufficiency challenge before ordering retrial was necessarily harmless because the record evidence was sufficient to establish the elements of first-degree witness-elimination murder. <u>See</u> <u>id.</u> at 578 n.7.

This timely appeal followed.

## II.     **Discussion**

We review <u>de novo</u> a district court's denial of a habeas petition brought pursuant to § 2241. <u>See</u> <u>Maldonado v. Scully</u>, 86 F.3d 32, 35 (2d Cir. 1996).[5] Insofar as it is unsettled in this circuit whether, on a § 2241 petition, a challenged state court decision is subject to <u>de novo</u> review or is afforded deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996) (codified at 28 U.S.C.

---

[5] Respondents do not challenge the district court's ruling that Hoffler's pretrial habeas petition is properly considered under 28 U.S.C. § 2241 rather than 28 U.S.C. § 2254. <u>See</u> <u>Hoffler v. Bezio</u>, 831 F. Supp. 2d at 574–75. Accordingly, we do not here decide whether pretrial habeas petitions can only be brought pursuant to § 2241.

§ 2254(d)), see Marte v. Vance, 480 F. App'x 83, 84 (2d Cir. 2012) (noting that question is unsettled), we need not conclusively answer that question in this case because respondents do not challenge the application of de novo review, and Hoffler's claims fail even under that more rigorous standard, see generally Perkins v. Herbert, 596 F.3d 161, 176 (2d Cir. 2010) (citing precedent that court need not decide which review standard applies where result is same under either test).[6]

Hoffler submits that the district court erred in concluding both that the Double Jeopardy Clause did not require the Appellate Division to resolve his sufficiency challenge before ordering retrial, and that, in any event, the evidence at Hoffler's first murder trial was sufficient to support a guilty verdict for first-degree murder. Respondents defend the district court's rulings and further assert that this court lacks jurisdiction over Hoffler's appeal because Hoffler failed to obtain a certificate of appealability ("COA") as required by 28 U.S.C. § 2253(c)(1)(A). Hoffler responds that no COA is required where habeas relief is sought pursuant to § 2241. Nevertheless, at oral argument, Hoffler moved for a COA to be granted nunc pro tunc should this court determine that a certificate is necessary to reach the merits of his appeal.

---

[6] Several of our sister courts of appeals have concluded that AEDPA deference does not apply "to habeas petitions brought by pretrial detainees under § 2241." Martinez v. Caldwell, 644 F.3d 238, 242 (5th Cir. 2011) (citing decisions by First, Ninth, and Tenth Circuits in reaching that conclusion).

We proceed to consider these arguments in turn, starting with the question of jurisdiction.

A.      A Certificate of Appealability Is a Jurisdictional Prerequisite to Appellate Review of the Denial of a § 2241 Petition Brought by a State Prisoner

While the "Privilege of the Writ of Habeas Corpus" is constitutionally protected from suspension except in limited circumstances, U.S. Const. art. I, § 9, cl. 2, once a final ruling has been made, the jurisdiction of appellate courts to review a habeas decision is delineated by statute, specifically 28 U.S.C. § 2253. That jurisdictional grant is cabined by certain conditions, including the COA requirement detailed in § 2253(c)(1):

> Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> (B) the final order in a proceeding under section 2255.

In circumstances where § 2253(c)(1) applies, "until a COA has been issued[,] federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); accord Gonzalez v. Thaler, 132 S. Ct. 641, 649 (2012).

There is no doubt that a state prisoner challenging his sentence under 28 U.S.C. § 2254(a), which permits a federal judge to grant a writ of habeas corpus to a prisoner who is "in custody pursuant to the judgment of a State court," must obtain a COA to appeal a district court judgment, since such a prisoner is challenging detention arising out of process issued by a state court. See Richardson v. Greene, 497 F.3d 212, 217 (2d Cir. 2007). We

16

have also held that a federal prisoner seeking habeas relief under 28 U.S.C. § 2241 is not required to obtain a certificate of appealability to take an appeal, inasmuch as he is neither challenging detention arising out of process issued by a state court, nor proceeding under § 2255.  See Murphy v. United States, 199 F.3d 599, 601 n.2 (2d Cir. 1999).  The question here is whether a state prisoner proceeding under 28 U.S.C. § 2241(c)(3), which permits a federal judge to grant a writ of habeas corpus to a prisoner who "is in custody in violation of the Constitution or laws or treaties of the United States," must obtain a COA to appeal.  In other words, we are asked whether a state petitioner seeking to prevent retrial under § 2241 is challenging detention "aris[ing] out of process issued by a State court," 28 U.S.C. § 2253(c)(1)(A), thereby triggering the COA requirement.

This court has not yet specifically ruled on whether a state prisoner must procure a COA to appeal a denial of habeas relief sought pursuant to 28 U.S.C. § 2241.  Every other court of appeals to have considered the issue, however, has concluded that § 2253(c)(1)(A) requires a COA in such circumstances.  See Evans v. Circuit Court, 569 F.3d 665, 666–67 (7th Cir. 2009); Wilson v. Belleque, 554 F.3d 816, 824–25 (9th Cir. 2009); Greene v. Tenn. Dep't of Corr., 265 F.3d 369, 372 (6th Cir. 2001); United States v. Cepero, 224 F.3d 256, 264 (3d Cir. 2000), abrogated on other grounds by Gonzalez v. Thaler, 132 S. Ct. at 647 n.1; Montez v. McKinna, 208 F.3d 862, 869 (10th Cir. 2000); Stringer v. Williams, 161 F.3d 259, 262 (5th Cir. 1998).  We now join our sister courts of appeals in reaching that same conclusion based on the statutory text and structure.

17

In § 2253(c)(1), Congress established a COA requirement in two distinct circumstances, the first applying to state prisoners, the second applying to federal prisoners. Section 2253(c)(1)(B) imposes a COA requirement on federal prisoners only with respect to appeals from final orders in proceedings arising under a single federal statute: 28 U.S.C. § 2255. By contrast, § 2253(c)(1)(A) does not limit the COA requirement for state prisoners to proceedings under any particular statute but, rather, imposes a COA requirement on final orders "in a habeas corpus proceeding" in which the challenged detention "arises out of process issued by a State court." The phrase "habeas corpus proceeding" speaks generally and, thus, cannot reasonably be construed to reference only habeas proceedings arising under 28 U.S.C. § 2254, while excluding habeas proceedings arising under § 2241. As the Ninth Circuit has observed, "had Congress intended to restrict the COA requirement for state detainees to petitions brought pursuant to § 2254, it would have simply employed the same straightforward language that it used in § 2253(c)(1)(B)" to limit the COA requirement to § 2255 proceedings. Wilson v. Belleque, 554 F.3d at 825. Thus, we conclude that, even if federal prisoners need obtain a COA only when appealing the denial of § 2255—and not § 2241—relief, a state prisoner is statutorily required to procure a COA to appeal from a final order in any habeas proceeding, without regard to whether that proceeding arose under § 2254, § 2241, or some other provision of law.[7]

_____

[7] Cases cited by Hoffler addressing the COA requirements for federal prisoners, see, e.g., Jeffers v. Chandler, 253 F.3d 827, 830 (5th Cir. 2001); Sugarman v. Pitzer, 170 F.3d 1145, 1146 (D.C. Cir. 1999), are simply inapposite and, therefore, warrant no discussion.

18

Here, Hoffler awaits retrial by order of New York's Appellate Division, Third Department, the same court that also rejected Hoffler's Article 78 argument that retrial violates double jeopardy. In these circumstances, a § 2241 petition complaining that Hoffler is "in custody in violation of the Constitution," 28 U.S.C. § 2241(c)(3), necessarily initiates "a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court," id. at § 2253(c)(1)(A).[8]  Accordingly, for Hoffler to appeal the district court's denial of habeas relief pursuant to § 2241, he was required to obtain a COA. See Wilson v. Belleque, 554 F.3d at 825 (holding COA required where petitioner appealed denial of § 2241 petition seeking to bar state retrial on double jeopardy grounds).

To secure a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Construing this requirement, the Supreme Court has instructed that a federal court should not deny a COA "merely because it believes the applicant will not demonstrate an entitlement to relief."  Miller-El v. Cockrell, 537 U.S.

---

[8] Respondents do not dispute that Hoffler is in "custody" for purposes of § 2241, and Hoffler does not contend that his § 2241 claim is anything but a challenge to "detention" for purposes of § 2253(c)(1)(A).  Thus, we need not here delineate the precise boundaries of those requirements.  We note only that the Supreme Court has broadly construed "custody" for purposes of habeas corpus, so as to reach restraints on liberty even when a defendant is not in "actual, physical custody," Jones v. Cunningham, 371 U.S. 236, 239 (1963), as for example when he is subject to the court's criminal jurisdiction though released on bail, see Lefkowitz v. Newsome, 420 U.S. 283, 286 n.2, 291 n.8 (1975), or on his own recognizance, see Hensley v. Mun. Court, 411 U.S. 345, 351 (1973).  Moreover, as the Ninth Circuit observed in Wilson v. Belleque, "[t]here is no analytically sound way to conclude that petitioners" incarcerated for one crime while fighting retrial on another are "'in custody' for purposes of § 2241(c)(3) but not challenging a 'detention' under § 2253(c)(1)(A)."  554 F.3d at 825.

at 337. Rather, a COA should issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." Slack v. McDaniel, 529 U.S. 473, 478 (2000). For the reasons set forth in section II.B. infra, we conclude that Hoffler has made the requisite "substantial showing" with respect to his claim that the Appellate Division could not, consistent with the constitutional prohibition on double jeopardy, order his retrial for the Drabik murder without first deciding whether the evidence at his initial trial was sufficient to support the jury verdict of guilty for first-degree witness-elimination murder. At the same time, we conclude that he has not made such a showing with respect to the other habeas claims he seeks to pursue on appeal.[9] Accordingly, we need consider only the former claim in deciding whether to grant Hoffler a COA.

In making that determination, we recognize that Hoffler's request for a COA at oral argument was untimely under Second Circuit Local Rule 22.1, which requires that COA motions be made within 28 days of the later of the district court's denial of a COA or the

---

[9] Hoffler purports to identify error in the district court's conclusions that (1) jeopardy did not terminate when he was first convicted for Drabik's murder; and (2) New York's nullified proceeding law, see N.Y. Crim. Proc. Law § 40.30(3), does not violate the Double Jeopardy Clause. These arguments admit no reasoned debate as to their merits. The Supreme Court has held that a conviction does not terminate jeopardy if appealed. See Sattazahn v. Pennsylvania, 537 U.S. 101, 106 (2003). Moreover, New York's nullified proceeding law, which permits retrial of a defendant where jeopardy has not terminated, see N.Y. Crim. Proc. Law § 40.30(3); Peter Preiser, Practice Commentaries, N.Y. Crim. Proc. Law § 40.30 (McKinney 2013), is consistent with the Double Jeopardy Clause, see Sattazahn v. Pennsylvania, 537 U.S. at 106.

Insofar as Hoffler does not appeal the district court's denial of an evidentiary hearing, we deem that claim abandoned. See Jackler v. Byrne, 658 F.3d 225, 233 (2d Cir. 2011).

filing of a notice of appeal. That rule, however, is not jurisdictional. See 28 U.S.C. § 2253(c) (prescribing no time limitation for issuance of COA); see also Gonzalez v. Thaler, 132 S. Ct. at 648–49 (holding that § 2253(c)(1)'s requirement that COA must issue before appeal may be taken is jurisdictional, but that remaining § 2253(c) requirements as to when COA may issue are non-jurisdictional); see generally Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1203 (2011) (identifying claim-processing rules, such as filing deadlines, as non-jurisdictional in absence of clear congressional intent to contrary). Thus, we can, and here do, exercise our discretion to excuse Hoffler's failure to make a timely COA application. See Fed. R. App. P. 26(b) (stating that, for good cause, courts may grant extension of time prescribed under rules or permit an act to be done after that time expires). Not only has our precedent failed previously to make clear that a state prisoner must obtain a COA to appeal from the denial of a § 2241 petition, but also court actions may have confused the issue in this case.[10] Insofar, however, as this opinion now makes clear that a state petitioner appealing from the denial of § 2241 relief must first secure a COA, we will not be inclined to grant future untimely applications for COAs in § 2241 cases.

---

[10] It appears that the court originally docketed Hoffler's case as an appeal from a § 2254 petition and thus issued an order directing Hoffler to move for a COA. See Dkt. No. 23. Upon notice that the appeal was, in fact, from the denial of a § 2241 petition, the court vacated its order requiring Hoffler to move for a COA. See Dkt. No. 25. Hoffler's counsel also represents that he was advised orally by a court staff member that no COA motion was necessary when a habeas petitioner sought relief under § 2241. See March 8, 2012 Decl. of Ray Kelly, Dkt. No. 35, ¶ 2.

Accordingly, we grant Hoffler a COA nunc pro tunc with respect only to his double jeopardy/sufficiency challenge to retrial, and we proceed to discuss the merits of that argument.

B.        Hoffler's Retrial Will Not Violate Double Jeopardy

The Constitution states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  "Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense."  Sattazahn v. Pennsylvania, 537 U.S. 101, 106 (2003).

Hoffler contends that if he is retried for the Drabik murder after having already been tried once for that crime on a record that he maintains was legally insufficient to support conviction, he will be placed in double jeopardy.  See Burks v. United States, 437 U.S. 1, 18 (1978) (holding that Double Jeopardy Clause bars retrial where appellate court finds evidence at first trial insufficient to support conviction).  He submits that the New York State courts violated his right not to be placed in double jeopardy by mistakenly concluding that he was never in jeopardy at his first trial and by failing to rule on his sufficiency challenge to the evidence supporting his first conviction.  We conclude that Hoffler was placed in jeopardy when he was first tried for the Drabik murder, but that his double jeopardy claim fails nonetheless because jeopardy never terminated with respect to that offense, and the trial

22

evidence was not insufficient as a matter of law to support a conviction for first-degree witness-elimination murder.

### 1. Attachment of Jeopardy

In rejecting Hoffler's double jeopardy challenge to retrial, the Appellate Division concluded that Hoffler had not been placed in jeopardy at his first trial because the petit jury that returned a guilty verdict had not been properly sworn to participate in voir dire, a fundamental error that invalidated the entire trial. See Hoffler v. Jacon, 72 A.D.3d at 1185, 897 N.Y.S.2d at 757–58. On de novo review of whether jeopardy attached at an initial state criminal proceeding, neither the state court's decision, nor the state law on which it relies, binds this court. As we stated in Boyd v. Meachum, 77 F.3d 60 (2d Cir. 1996), "[t]he contours of the Fifth Amendment's guarantee against double jeopardy are indisputably federal," and "a federal constitutional right, to have any constant and discernible substance, cannot turn on the vagaries of state procedural definitions," id. at 65 (internal quotation marks omitted). Here, two strands of federal law prompt us to conclude that Hoffler was placed in jeopardy at his initial state trial for first-degree witness-elimination murder.

The first strand derives from the Supreme Court's decision in Serfass v. United States, 420 U.S. 377 (1975), and this court's decision in United States v. Wedalowski, 572 F.2d 69 (2d Cir. 1978). In Serfass, the Supreme Court observed that, for purposes of reviewing double jeopardy challenges, "courts have found it useful to define a point in criminal proceedings at which the constitutional purposes and policies are implicated by resort to the

23

concept of attachment of jeopardy." 420 U.S. at 388 (internal quotation marks omitted). In the case of a jury trial, that point is when a jury is "empaneled and sworn." Id.; accord United States v. Razmilovic, 507 F.3d 130, 136 (2d Cir. 2007).

In Wedalowski, this court held that Serfass's use of "the word 'sworn' refers, of course, to the trial jury oath and not to the voir dire oath." 572 F.2d at 74. We reached that conclusion in rejecting a defendant's claim that he was already in jeopardy when a trial court granted a motion to dismiss after jurors had been selected from a venire but before they had sworn the trial jury oath. See id. at 74–75. What is significant for our review of Hoffler's claim is that Wedalowski construed the word "sworn" to refer only to the trial jury oath and "not to the voir dire oath." Id. at 74 (emphasis added). It notably did not hold that "the word 'sworn' refers, of course, to the trial jury oath [as well as] the voir dire oath." Id.

Here, there is no question that the jurors empaneled to hear the evidence and return a verdict in Hoffler's case swore to the required trial jury oath. Thus, whatever state law error may have occurred in the administration of a voir dire oath to the venire panel from which trial jurors were selected does not alter the fact that Hoffler was tried before a jury "empaneled and sworn" to the trial jury oath. That was sufficient to place Hoffler once in jeopardy and to afford him the constitutional protection against being so placed a second time.

A second strand of precedent distinguishing between void and voidable judgments in the double jeopardy context reinforces that conclusion. Generally, a judgment is "void"

24

where a court "usurp[s] a power without jurisdiction," while a judgment is "voidable" where a court commits error while properly exercising jurisdiction. Dennison v. Payne, 293 F. 333, 341 (2d Cir. 1923). In Ball v. United States, 163 U.S. 662 (1896), the Supreme Court held that only in the former, narrowly confined circumstance does jeopardy fail to attach, see id. at 669–70. The government there argued that double jeopardy did not bar it from retrying a defendant acquitted of murder because a defect in the indictment had deprived the trial court of jurisdiction ab initio, thereby precluding jeopardy from attaching. See id. at 664–67. Rejecting the government's broad view of jurisdictional error, the Supreme Court stated:

> An acquittal before a court having no jurisdiction is, of course, like all the proceedings in the case, absolutely void, and therefore no bar to subsequent indictment and trial in a court which has jurisdiction of the offense. But, although the indictment was fatally defective, yet, if the court had jurisdiction of the cause and of the party, its judgment is not void, but only voidable by writ of error.

Id. at 669–70 (emphasis added; citations omitted); see 6 Wayne R. LaFave et al., Criminal Procedure § 25.1(d) (3d ed. 2012) (noting that Ball rejected broad view of jurisdictional error, instead holding that court needs only "authority . . . to render judgment" for jeopardy to attach). Having concluded that the defective indictment rendered the judgment voidable, but not void, the Court held that jeopardy attached at trial and that the government could not retry the defendant for murder. See Ball v. United States, 163 U.S. at 670; accord Kepner v. United States, 195 U.S. 100, 130 (1904) ("It is, then, the settled law of this court that former jeopardy includes one who has been acquitted by a verdict duly rendered, although no judgment be entered on the verdict, and it was found upon a defective indictment.");

25

Illinois v. Somerville, 410 U.S. 458, 467–69 (1973) (concluding jeopardy attached in state trial on defective indictment).

Significantly, for purposes of our review here, when in Benton v. Maryland, 395 U.S. 784 (1960), the Supreme Court held that the Double Jeopardy Clause applied fully to the states, it reiterated the distinction between void and voidable judgments in the context of a jury selection error, see id. at 795–97. In Benton, a defendant convicted of burglary but acquitted of larceny was granted a new trial by the state because a constitutionally impermissible oath had been administered to both the grand jury that returned the original indictment and the petit jury that rendered the trial verdict. See id. at 785–86. The state retried the defendant, however, on both the burglary and larceny counts, maintaining that the jury error rendered the initial indictment "absolutely void," and that a defendant "cannot be placed in jeopardy by a void indictment." Id. at 796 (internal quotation marks omitted). The Supreme Court rejected that argument in holding that the defendant could not be retried for larceny. It concluded that "at worst the indictment would seem only voidable at the defendant's option, not absolutely void." Id. at 797; see also id. at 796 (characterizing state's voidness argument as "a bit strange . . . since petitioner could quietly have served out his sentence under this 'void' indictment had he not appealed his burglary conviction"). In so stating, the Court reiterated Ball's holding that "'if the court had jurisdiction of the cause and of the party, its judgment is not void, but only voidable by writ of error.'" Id. at 797 (quoting Ball v. United States, 163 U.S. at 669–70). The Court grounded this conclusion in the

26

common law roots of the Double Jeopardy Clause, specifically Blackstone's reference to a "plea of <u>autrefoits acquit</u>" or former acquittal. <u>Id.</u> at 795 (internal quotation marks omitted). In short, it is the law's longstanding opposition to retrying an acquitted defendant that demands that only a narrow category of judgments be recognized as void rather than voidable. <u>See</u> <u>id.</u> at 795–97.[11]

We think the same conclusion that the Supreme Court reached in <u>Benton</u> with respect to a constitutional error in the oath administered to grand and trial juries necessarily applies to a state law error in the oath administered to a venire panel. As long as the trial court has jurisdiction of the cause and the party, such jury oath errors render ensuing judgments voidable but not void. Indeed, the conclusion is particularly apt here, where there is no question that the petit jurors empaneled from a mistakenly sworn venire were nevertheless properly sworn according to the trial jury oath. <u>See</u> <u>United States v. Wedalowski</u>, 572 F.2d at 74.[12]

_____

[11] The distinction between void and voidable judgments is of less significance to a defendant initially found guilty because a reversal on either ground will generally result in his retrial, either because jeopardy never attached, in the rare case of a void judgment, or because it never terminated, in the more common case of a voidable judgment. <u>See</u> <u>infra</u> at **[31–32]**. Thus, the question of whether Hoffler's reversed judgment of conviction was void or voidable is pertinent only insofar as it bears on the issue of whether a reviewing court was obliged to rule on his sufficiency challenge before ordering retrial.

[12] <u>Batson</u> jurisprudence also supports the conclusion that jury selection errors generally render trial judgments voidable but not void. <u>See</u> <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). Insofar as lack of jurisdiction is what renders a judgment void, <u>see</u> <u>Ball v. United States</u>, 163 U.S. at 669–70, such a defect cannot be waived and may be raised at any time while a case is pending, <u>see</u> Fed. R. Crim. P. 12(b)(3)(B). But courts, including this one,

27

The conclusion that few errors will render a judgment void is bolstered by United States v. Sabella, 272 F.2d 206 (2d Cir. 1959). There, the government defended against a double jeopardy challenge to a conviction secured on retrial by arguing that a defect in the statute supporting defendants' original conviction—specifically, the absence of any sentencing authority—deprived the trial court of jurisdiction to enter the original judgment. See id. at 207, 209. In rejecting this argument, Judge Friendly, writing for the court, explained that Ball referenced "jurisdiction" in the "basic sense," asking only whether a "cause of action under our law was asserted," and whether "the court had power to determine whether it was or was not well founded in law and effect." Id. at 209 (internal quotation marks omitted); see LaFave § 25.1(d) (stating that "concept of judicial competency or jurisdiction acting as a prerequisite for double jeopardy protection" is "quite narrow" (internal quotation marks omitted)). These "basic" jurisdiction questions required affirmative answers in Sabella because the district court, in addition to having personal jurisdiction over defendants and territorial jurisdiction over their alleged actions, had jurisdiction to try the charged conduct and "to render a judgment convicting the defendants, despite the fact that

---

require that Batson equal protection challenges be raised during jury selection and deem them waived once the jury is sworn. See McCrory v. Henderson, 82 F.3d 1243, 1248–49 (2d Cir. 1996) (collecting cases); see also United States v. Sammaripa, 55 F.3d 433, 434–35 (9th Cir. 1995) (holding that prosecution's failure to raise Batson challenge during jury selection precluded court from declaring mistrial based on defendant's Batson error in exercising peremptory challenge). Thus, a Batson jury selection error, which if preserved will warrant reversal even without a showing of prejudice, see Tankleff v. Senkowski, 135 F.3d 235, 248 (2d Cir. 1998), nevertheless does not deprive a court of its "fundamental power" to hear a case, Boyd v. Meachum, 77 F.3d at 65, so as to render the judgment void.

28

it could not lawfully impose a penalty." 272 F.2d at 209. Thus, despite the statutory lack of authority to impose sentence, the original vacated judgment was voidable rather than void, and the defendants were indeed placed in jeopardy.

More recently, this court clarified that, in making a double jeopardy assessment of a state court's initial exercise of jurisdiction, a federal court may consider, but is not bound by, state law. See Boyd v. Meachum, 77 F.3d at 65 (stating that question whether "state court had sufficient jurisdiction for jeopardy to attach . . . is necessarily one of federal law"). Moreover, Boyd emphasized that a party claiming lack of jurisdiction to defeat a double jeopardy claim carries a particularly heavy burden. Thus, a party asserting that a state court judgment is void for lack of personal jurisdiction "must show that, in a larger sense, the state court was without fundamental power to exercise jurisdiction over his person." Id. (emphasis added). In other words, it must demonstrate "not merely that the criminal court did not properly exercise jurisdiction over [defendant's] person as a matter of state law, but rather that the court could not exercise personal jurisdiction over him without violating the Constitution, or perhaps other federal law depriving the state court of personal jurisdiction." Id. Absent such a showing, a judgment may be voidable, but it is not void so as to preclude jeopardy from attaching. See id. at 66 (rejecting defendant's argument that jeopardy did not attach, because there was "no claim that he was tried in the wrong court, or was tried in absentia, or was otherwise denied due process," or that trial court exercised jurisdiction over him in violation of Constitution or federal law).

29

Consistent with these precedents, we here conclude that the state trial court did not lack the fundamental power or basic jurisdiction to try Hoffler for Drabik's murder.  See Boyd v. Meachum, 77 F.3d at 65; United States v. Sabella, 272 F.2d at 209.  Rensselaer County Court undoubtedly had jurisdiction to try the charged offense of first-degree murder, as well as lesser homicide crimes.  See N.Y. Crim. Proc. Law §§ 10.10(2)(b), 10.20(1)(a) (stating that county courts have jurisdiction to try felonies).  That court also had territorial jurisdiction over Drabik's homicide, see id. § 20.40(1) (stating that criminal court of particular county has jurisdiction if conduct constituting an element of the offense occurred within county), and personal jurisdiction over Hoffler, see People v. Stirrup, 91 N.Y.2d 434, 439, 671 N.Y.S.2d 433, 437 (1998) (citing N.Y. Crim. Proc. Law § 1.20(9)) (stating that criminal court obtains personal jurisdiction over defendant upon filing of accusatory instrument and defendant's appearance in court).[13]  Moreover, the state court's exercise of jurisdiction at Hoffler's first trial does not raise any constitutional or federal law concerns.

In these circumstances, even if New York, in applying its own law, treats the failure to administer the proper voir dire oath to the venire as an error that "invalidate[s] the entire trial," People v. Hoffler, 53 A.D.3d at 124, 860 N.Y.S.2d at 272, for purposes of the Fifth Amendment protection against double jeopardy, this is the sort of non-jurisdictional trial

---

[13] We need not here decide whether, for purposes of double jeopardy, it is New York State rather than particular New York courts that must have jurisdiction over the cause and person.  See generally N.Y. Crim. Proc. Law § 40.30(2)(a) (stating that New York's double jeopardy statute does not bar retrial where first prosecution "occurred in a court which lacked jurisdiction over the defendant or the offense").

30

error that rendered the initial judgment voidable, but not void. Thus, consistent with Ball, Benton, Sabella, and Boyd, we conclude that, even though the first judgment of conviction was voidable, Hoffler was placed in jeopardy at the initial Drabik murder trial.

### 2. Review of Insufficiency Claims on Direct Appeal

Where a defendant placed in jeopardy at trial is acquitted, jeopardy terminates with the judgment of acquittal, and the Double Jeopardy Clause bars retrial. See, e.g., Boyd v. Meachum, 77 F.3d at 63. But where jeopardy has attached and a defendant is convicted, retrial on the same charges is not constitutionally barred where it results from a reversal of conviction based on the defendant's own successful demonstration of trial error on appeal. See id. In such circumstances, the law does not view jeopardy as terminating or the retrial as putting a defendant in jeopardy a second time. See id. Rather, it views the retrial as "a facet of the original jeopardy." Id. (observing that "first jeopardy does not end with conviction, but rather continues through the appeal, and if successful, the remand and retrial are part of the original jeopardy").

This conclusion does not apply, however, where an appellate court finds the evidence at the first trial insufficient to support conviction. In such circumstances, "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." Burks v. United States, 437 U.S. at 11. As Burks explained, a reversal for insufficient evidence "means that the government's case was so lacking that it should not have even been

31

submitted to the jury" a first time.  Id. at 16 (emphasis in original).  Hoffler argues that the

Double Jeopardy Clause not only bars retrial when a conviction is reversed for insufficient

evidence, but also compels a reviewing court to resolve any insufficiency claim before

ordering retrial based on trial error.  In support, he relies on Justice Brennan's concurring

opinion in Justices of Boston Municipal Court v. Lydon, 466 U.S. 294 (1984).  There, Justice

Brennan, joined by Justice Marshall, stated as follows:

> [W]hen a defendant challenging his conviction on appeal contends both that
> the trial was infected by error and that the evidence was constitutionally
> insufficient, the court may not, consistent with the rule of Burks v. United
> States, 437 U.S. 1 (1978), ignore the sufficiency claim, reverse on grounds of
> trial error, and remand for trial. . . . [I]f retrial is to be had, the evidence must
> be found to be legally sufficient, as a matter of federal law, to sustain the jury
> verdict.

Id. at 321–22 (Brennan, J., concurring in part and concurring in the judgment) (internal

quotation marks omitted).  Hoffler submits that this court adopted Justice Brennan's view as

its own in United States v. Wallach, 979 F.2d 912 (2d Cir. 1992), when it stated:  "A reversal

on the basis of insufficiency of evidence, like an acquittal, bars a retrial, see Burks v. United

States, 437 U.S. at 16–17, and a reversal of a conviction on grounds other than sufficiency

does not avoid the need to determine the sufficiency of the evidence before a retrial may

occur."  Id. at 917 (emphasis added; citation omitted).

Wallach made the highlighted point in reviewing a federal conviction.  Nowhere in

the opinion, however, did we indicate whether we were identifying a prudential rule for the

courts of this circuit or a generally applicable constitutional requirement.  Insofar as Hoffler

32

urges the latter, he confronts a hurdle: the Supreme Court's decision in Richardson v. United States, 468 U.S. 317 (1984), decided only two months after Justices of Boston Municipal Court v. Lydon. In there ruling that jeopardy does not terminate when a court declares a mistrial based on a hung jury, the Supreme Court specifically held that an appellate court was not required to rule on the sufficiency of the evidence before ordering retrial. See 468 U.S. at 323 ("Where, as here, there has been only a mistrial resulting from a hung jury, Burks simply does not require that an appellate court rule on the sufficiency of the evidence because retrial might be barred by the Double Jeopardy Clause.").

Hoffler submits that Richardson's rejection of a sufficiency-ruling requirement for retrial does not apply outside the mistrial context. Our sister courts of appeals have divided on that question, as well as on the issue of whether sufficiency review before retrial is prudentially sound or constitutionally required. See LaFave § 25.4(c) (noting circuit split); compare United States v. Wiles, 106 F.3d 1516, 1518 (10th Cir. 1997) (identifying double jeopardy requirement to review preserved sufficiency claim before ordering retrial based on trial error); Palmer v. Grammer, 863 F.2d 588, 592 (8th Cir. 1988) (same); Vogel v. Pennsylvania, 790 F.2d 368, 376 (3d Cir. 1986) (same), with Foxworth v. Maloney, 515 F.3d 1, 4 (1st Cir. 2008) (adopting prudential rather than constitutional rule requiring review of preserved sufficiency challenges before ordering retrial); Patterson v. Haskins, 470 F.3d 645, 655–60 (6th Cir. 2006) (concluding, in case where appeals court erroneously failed to follow its own prudential rule to review sufficiency challenges before ordering retrial, that error did

not subject defendant to unconstitutional retrial; "what activates the Burks [double jeopardy] rule is not the abstract possibility that the evidence was insufficient, but the appellate court's declaration to that effect. Absent such a declaration, jeopardy continues, and the defendant can be tried once again on the same charges." (emphasis in original)); United States v. Bobo, 419 F.3d 1264, 1268 (11th Cir. 2005) (citing circuit precedent that prudential rule requiring sufficiency review even when conviction reversed on other ground is not mandated by Double Jeopardy Clause); United States v. Recio, 371 F.3d 1093, 1104 (9th Cir. 2004) (referencing court's "policy" to consider sufficiency claims on appeal from final judgment); United States v. Miller, 952 F.2d 866, 871–74 (5th Cir. 1992) (concluding that Richardson is not limited to mistrials but, rather, generally "refuses to extend Burks beyond instances in which the appellate court in fact reversed for insufficient evidence"; observing nevertheless that "[a]lthough not mandated by the double jeopardy clause, it is . . . clearly the better practice" for appellate court to dispose of preserved sufficiency challenge before ordering retrial (emphasis in original)); United States v. Douglas, 874 F.2d 1145, 1149–51 (7th Cir. 1989) (stating "we are not convinced, in light of Richardson, that the Double Jeopardy Clause compels an appellate court to review the sufficiency of the evidence offered at trial anytime a defendant raises the question," but "to accomplish the same purpose, [we are] prepared to adopt a policy in this circuit of routinely addressing evidentiary sufficiency in criminal cases when a defendant presents the issue on appeal"), abrogated on other grounds by United States v. Durrive, 902 F.2d 1221, 1226 (7th Cir. 1990).

In sum, while only a few courts of appeals have concluded that the Double Jeopardy Clause, as construed by the Supreme Court in <u>Burks</u>, compels sufficiency review before ordering retrial based on trial error, the courts of appeals, our own included, are unanimous in concluding that such review is warranted, at a minimum, as a matter of prudent policy. <u>See</u> <u>United States v. Bruno</u>, 661 F.3d at 743 (stating that court should review sufficiency challenge absent "sound reason" for not doing so); <u>United States v. Wallach</u>, 979 F.2d at 917. In this respect the Seventh Circuit has explained that such a policy "need not" be "anchor[ed] . . . in the Double Jeopardy Clause" because a sufficient rationale lies in a proper "concern for the preservation of scarce and costly resources." <u>United States v. Douglas</u>, 874 F.2d at 1150. This comports with our own practical observation that if a reviewing court were to order a new trial without addressing a sufficiency challenge, it "could result in the futility of a second conviction that would have to be reversed in a second appeal." <u>United States v. Allen</u>, 127 F.3d 260, 264 (2d Cir. 1997).

Thus, we easily identify in our own precedent at least a prudential rule generally requiring reviewing courts to consider preserved sufficiency challenges before ordering retrials based on identified trial error. We see no reason here to decide the more difficult question of whether such a rule is also constitutionally compelled by the Double Jeopardy Clause because, even if it were, any Appellate Division error in failing to review Hoffler's sufficiency challenge would necessarily be harmless given that the challenge is meritless.

3.  Because Hoffler's Sufficiency Challenge Is Meritless, Any Appellate Division Error in Failing To Review Sufficiency on Direct Appeal Was Necessarily Harmless Beyond a Reasonable Doubt

a.  Harmless Error Standard

The test for harmless constitutional error on direct appeal is whether the error at issue "was harmless beyond a reasonable doubt." Corby v. Artus, 699 F.3d 159, 169 (2d Cir. 2012) (citing Chapman v. California, 386 U.S. 18, 24 (1967)). On review of a habeas claim by a state prisoner, however, "because of the deference we afford to state courts, we 'find an error harmless unless it had substantial and injurious effect or influence in determining the jury's verdict.'" Id. (quoting Fry v. Pliler, 551 U.S. 112, 116 (2007)). To the extent it is unsettled in this circuit what deference is owed a state court decision on § 2241 review, see supra at **[15]**, it is also unclear which harmless error standard should apply in that context. We need not resolve this question here, however, because Hoffler's sufficiency claim is meritless. Thus, any Appellate Division error in failing to conduct sufficiency review on direct appeal before ordering retrial is necessarily harmless even under the more rigorous reasonable doubt standard. See generally Perkins v. Herbert, 596 F.3d at 176.

b.  The Evidence at Hoffler's First Trial Was Sufficient To Support His Conviction for First-Degree Murder

A defendant challenging the sufficiency of the evidence bears a heavy burden because, even when we consider the question de novo, we must view the evidence in the light most favorable to the prosecution, and doing so, must uphold the jury verdict as long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable

36

doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); accord United States v. Rojas, 617 F.3d 669, 674 (2d Cir. 2010).

Under New York law, "[w]itness elimination murder is committed when a defendant intentionally kills a victim who 'was a witness to a crime committed on a prior occasion and the death was caused for the purpose of preventing the intended victim's testimony in any criminal action.'" People v. Cahill, 2 N.Y.3d 14, 56, 777 N.Y.S.2d 332, 353–54 (2003) (emphasis omitted) (quoting N.Y. Penal Law § 125.27(1)(a)(v)). A defendant is liable for witness-elimination murder committed by another person when, acting with the intent to kill, the defendant "solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." N.Y. Penal Law § 20.00; see People v. Glanda, 5 A.D.3d 945, 949, 774 N.Y.S.2d 576, 580 (3d Dep't 2004) ("[A]ccomplice liability pursuant to [N.Y. Penal Law § 20.00], except as limited by Penal Law § 125.27(1)(a)(vii), applies to all other provisions of murder in the first degree") (alteration and internal quotation marks omitted)). When we view the evidence at Hoffler's first murder trial in the light most favorable to the prosecution, we easily conclude that a rational trier of fact could have found him guilty beyond a reasonable doubt of the charged first-degree witness-elimination murder.

First, the evidence established that Hoffler had a strong motive to commit the charged murder. Drabik was, after all, an eyewitness to and participant in the drug transactions with which Hoffler was charged. Thus, he was in a position to provide powerful, direct evidence of Hoffler's culpability. Moreover, Drabik was not a coincidental witness to Hoffler's

criminal conduct. He had specifically identified Hoffler—or, as he knew him, "Murder"—as a drug dealer and was cooperating with authorities when he participated in the charged drug transactions.

Second, the evidence established that Hoffler had the means to effect Drabik's murder in the person of Brooklyn gunman Heckstall. An eyewitness account of Drabik's murder indicated that Heckstall was the actual shooter. Not only had Heckstall and Hoffler been neighbors years before in Brooklyn, but several eyewitnesses also testified to seeing the two men together in Albany at and about the time of the Drabik murder. One eyewitness testified that Heckstall was in possession of a loaded firearm while in Albany, and that Heckstall brought this gun with him when Hoffler picked him up early one morning around the time of the Drabik killing. A number of witnesses testified that during this same time they saw Hoffler and Heckstall traveling together in a gray or dark SUV. Such a vehicle was spotted parked with its lights on at the time and near the site of the Drabik murder, and departing when a man entered the passenger side at about the same time as the shooter was seen fleeing the scene. Business, bank, and police records indicated that Hoffler rented such an SUV in Albany a few days before the Drabik murder and returned the vehicle, also in Albany, on the night of the murder—but only after driving the SUV to Brooklyn. These circumstances supported an inference that Hoffler drove Heckstall back to Brooklyn almost immediately after the Drabik murder. Moreover, when Heckstall appeared at a family member's home

38

in Brooklyn later on the day of Drabik's murder, he was in possession of a significant amount of money, which a rational jury could infer was his payment for the killing.

Third, telephone and computer records strongly supported an inference that Hoffler lured Drabik to his death. Specifically, a cell phone registered to Hoffler's residence called Drabik's home the night before his death, at a time when Drabik's mother recalled that her son received a telephone call from someone professing an interest in meeting Drabik the following morning to discuss a construction job. That same night, a computer in Hoffler's home was used to access a realty site providing information on 478 Sixth Avenue in Troy, New York, the very location to which a caller would direct Drabik early the next morning—purportedly for a construction-job meeting, but actually for his death.

From the totality of these circumstances, a reasonable jury could certainly draw the inferences necessary to find beyond a reasonable doubt not only that Hoffler and Heckstall agreed to kill Drabik, but also that Hoffler solicited Heckstall to commit the murder and then aided him in carrying it out.

Hoffler nevertheless submits that the evidence was insufficient to find him guilty of first-degree witness-elimination murder because the prosecution failed to show how he would have learned that Drabik was a confidential informant. The point merits little discussion. Witness-elimination murder does not require proof that a defendant knew the victim was an informant. It requires only that the victim have been a witness to a crime and that a defendant murder the victim with the intent to prevent him from testifying in a criminal

39

proceeding. Here, although the authorities were careful not to disclose Drabik's identity or his cooperator status, a rational jury could infer that, once Hoffler was provided with particulars as to the drug transactions with which he was being charged, he knew from his own participation in these transactions that he had provided the drugs at issue to Drabik and recognized the possibility that Drabik could provide inculpatory evidence against him at trial. Moreover, given the timing of Drabik's murder—only days before Hoffler's drug trial was to commence—and the strong circumstantial evidence of Hoffler's involvement therein, a rational jury could conclude that Hoffler's purpose in arranging for Drabik's murder was to prevent Drabik from testifying against him at the forthcoming trial.

Hoffler further asserts that the prosecution failed to adduce evidence sufficient to prove that the Gregory Heckstall who shot Drabik was the same Gregory Heckstall with whom Hoffler had a relationship. To the extent the prosecution evidence identified Heckstall by name rather than by photographic or other physical evidence, New York law requires something more to show identity of person. See People v. Reese, 258 N.Y. 89, 96, 179 N.E. 305, 306 (1932) ("Identity of name is not always sufficient in a criminal prosecution to show identity of person, but it may be accepted as sufficient if fortified by circumstances . . . ." (citation omitted)); People v. Rattelade, 226 A.D.2d 1107, 1108, 642 N.Y.S.2d 1, 1 (4th Dep't 1996) (holding identity of name sufficient when supported by "further, connecting evidence" (internal quotation marks omitted)). Here, the requisite connecting evidence was varied and included, (1) the possession of a loaded firearm by the Heckstall seen with Hoffler

40

at and about the time of the Drabik murder and the use of a firearm by the Heckstall who shot Drabik, (2) the similarity between the SUV seen leaving the scene of the Drabik shooting and the SUV in which Hoffler and Heckstall were seen together in Albany at and about the same time, and (3) telephone and computer records indicating Hoffler's involvement in luring Drabik to his death, making Hoffler himself the link between the Heckstall who shot Drabik dead at the site to which he was lured and the armed Heckstall with whom Hoffler was seen by various persons in Albany at and about the time of the murder.

Insofar as Hoffler further argues that the evidence could not be sufficient to convict him in the absence of evidence excluding Michael Pearson, another drug confederate of Drabik, as the shooter, that argument is meritless. See United States v. Ogando, 547 F.3d 102, 107 (2d Cir. 2008) (stating that government is not "required to preclude every reasonable hypothesis which is consistent with innocence" (internal quotation marks omitted)).

In sum, because the evidence at Hoffler's first murder trial was sufficient as a matter of law to permit a rational jury to find him guilty beyond a reasonable doubt of first-degree witness-elimination murder, double jeopardy does not preclude his retrial. Thus, even if the Appellate Division erred in failing to rule on sufficiency before ordering retrial, the error was necessarily harmless beyond a reasonable doubt.

## III.    Conclusion

To summarize, we conclude as follows:

1.  Because 28 U.S.C. §  2253(c)(1)(A) requires a COA to appeal "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court," without regard to the statutory section under which the habeas proceeding was filed, a state prisoner must secure such a certificate in order to appeal from the denial of habeas relief sought pursuant to 28 U.S.C. § 2241, 28 U.S.C. § 2254, or any other provision of law.  Insofar as Hoffler's habeas petition was brought pursuant to § 2241 and our precedent had not previously made the COA requirement plain with respect to such petitions, we excuse Hoffler's failure to seek a COA within the time prescribed by our local rules and grant his belated COA request nunc pro tunc, limiting the grant to his double jeopardy/sufficiency challenge.

2.  Hoffler was placed in jeopardy at his first murder trial because the empaneled jury that returned a verdict of guilty was duly sworn in accordance with the jury trial oath.  To the extent the Appellate Division reversed Hoffler's conviction because of a failure to administer the correct voir dire oath to the venire panel from which the petit jury was selected, the error made the judgment voidable but not void, and thus did not prevent jeopardy from attaching.

3.  The evidence at Hoffler's first trial was sufficient to permit a rational jury to find him guilty beyond a reasonable doubt of first-degree murder in violation of N.Y. Penal Law §§ 20.00, 125.27(1)(a)(v), and thus the Double Jeopardy Clause does not bar his retrial

following reversal of his initial conviction based on the error in swearing the venire panel. In light of this determination, we need not here decide whether the Constitution, in addition to prudent policy, requires a reviewing court to address a sufficiency challenge before ordering retrial because any possible error by the Appellate Division in that regard was necessarily harmless beyond a reasonable doubt.

The judgment of the district court denying Hoffler's § 2241 petition to prevent New York State from retrying him for murder is AFFIRMED.