People v Hoffler
2026 NY Slip Op 04004
June 25, 2026
Appellate Division, Third Department
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

The People of the State of New York, Respondent,
v
Michael Hoffler, Also Known as Murder, Appellant.

Decided and Entered:June 25, 2026
108419
Calendar Date: March 25, 2026
Before: Garry, P.J., Powers, Mackey And Ryba, JJ.; Fisher, J., Vouched In.

Mitchell S. Kessler, Cohoes, for appellant.
Mary Pat Donnelly, District Attorney, Troy (Michael Allain of counsel), for respondent.

[*1]
Mackey, J.
Appeal from a judgment of the County Court of Rensselaer County (Andrew Ceresia, J.), rendered March 16, 2016, upon a verdict convicting defendant of the crime of murder in the first degree.
The underlying facts of this case are familiar to this Court, having been the subject of two prior appeals (Matter of Hoffler v Jacon, 72 AD3d 1183 [3d Dept 2010], appeal dismissed 15 NY3d 768 [2010], lv denied 15 NY3d 872 [2010], lv dismissed 22 NY3d 1166 [2014], cert denied 574 US 868 [2014]; People v Hoffler, 53 AD3d 116 [3d Dept 2008], lv denied 11 NY3d 832 [2008]). Briefly, in December 2003, defendant allegedly arranged for Gregory Heckstall FN1FN2 to shoot and kill Christopher Drabik (hereinafter the victim), a confidential informant (hereinafter CI), in the City of Troy, Rensselaer County, to prevent the victim's anticipated testimony in defendant's January 2004 drug trial. Defendant was thereafter charged with, among other crimes, murder in the first degree and murder in the second degree.FN3
Following a jury trial, defendant was convicted of murder in the first degree and sentenced to life imprisonment without the possibility of parole (Matter of Hoffler v Jacon, 72 AD3d at 1183). Subsequently — and without addressing defendant's challenges to the legal sufficiency or weight of the evidence — this Court reversed defendant's conviction on the law, finding that the failure to administer the proper oath to prospective jurors in accordance with CPL 270.15 (1) (a) constituted reversible error and "invalidated the entire trial" (People v Hoffler, 53 AD3d at 124), and the matter was remitted for a new trial (id.). Thereafter, defendant commenced a CPLR article 78 proceeding seeking a writ of prohibition to bar his retrial, on grounds of double jeopardy (Matter of Hoffler v Jacon, 72 AD3d at 1184). This Court dismissed the petition, concluding that jeopardy never attached because "the trial was a nullity and [defendant] was never 'prosecuted' under the indictment" (id. at 1185).
Defendant then filed a writ of habeas corpus in federal court seeking, among other things, dismissal of the indictment on double jeopardy grounds, which petition was dismissed and denied (see Hoffler v Bezio, 831 F Supp 2d 570, 582 [ND NY 2011], affd 726 F3d 144 [2d Cir 2013]). The Second Circuit Court of Appeals affirmed finding that, although jeopardy had attached at the initial trial, retrial was not constitutionally barred as the evidence adduced at the first trial was legally sufficient to support the conviction (Hoffler v Bezio, 726 F3d 144, 159-165 [2d Cir 2013]). In 2016, the retrial finally proceeded and defendant was again convicted of murder in the first degree, for which he was sentenced to life imprisonment without the possibility of parole. Defendant appeals.
Preliminarily, we find unavailing defendant's contention that his retrial violated the constitutional prohibition against double jeopardy. Defendant argues that the evidence at his first trial was legally insufficient [*2]to support the verdict and that the verdict was also against the weight of the evidence. Thus, defendant asserts, he could not constitutionally be retried. Initially, upon application of a nearly identical standard to that applied in this Court, the Second Circuit has already determined that the evidence in defendant's first trial was legally sufficient and, upon our review, we agree (see People v Lall, 223 AD3d 1098, 1100 [3d Dept 2024], lv denied 41 NY3d 984 [2024]; People v Lau, 11 AD3d 482, 483 [2d Dept 2004], lv denied 4 NY3d 765 [2005]). In any event, "our weight of the evidence analysis nevertheless involves consideration of whether the proof supports each of the elements of the crimes" (People v Bonilla, 229 AD3d 850, 850 [3d Dept 2024], lv denied 42 NY3d 1018 [2024]; see People v Flynn, 233 AD3d 1087, 1088 [3d Dept 2024], lv denied 44 NY3d 982 [2025]). "[W]hen conducting a weight of the evidence review, [this Court] must view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Dillon, 231 AD3d 1352, 1353 [3d Dept 2024] [internal quotation marks and citations omitted]; see People v Warr, 237 AD3d 1262, 1263 [3d Dept 2025], lv denied 43 NY3d 1059 [2025]).
"A person is guilty of murder in the first degree when," as is relevant here, "with intent to cause the death of another person, he [or she] causes the death of such person . . . [and] the intended victim was a witness to a crime committed on a prior occasion and the death was caused for the purpose of preventing the intended victim's testimony in any criminal action or proceeding . . . [and] [t]he defendant was more than [18] years old at the time of commission of the crime" (Penal Law § 125.27 [1] [a] [v]; [b]). A person is guilty of such crime when committed by another person when, "acting with the mental culpability required for the commission thereof, he [or she] solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct" (Penal Law § 20.00; see People v Rivera, 212 AD3d 942, 945 [3d Dept 2023], lv denied 39 NY3d 1113 [2023]).
Taken together, the evidence and testimony adduced at defendant's first trial established that the victim had been working with the City of Albany police department as a CI at the time of his death. In that capacity, the victim participated in two arranged buys to purchase drugs from an individual known to him as "Murder." Following a traffic stop immediately after the second controlled buy, and a later operation with a different CI, defendant was identified as "Murder" by a police detective involved in the case. Although the victim's name was never divulged in defendant's underlying drug prosecution, many details of the subject [*3]drug transactions were disclosed at a related suppression hearing, where defendant was present.
Further, although an eyewitness identified Heckstall as the person who shot and killed the victim, the evidence also established that Heckstall and defendant, who had previously been neighbors in Brooklyn, were seen together in Albany around the time of the murder. One witness testified that she spent the evening prior to the shooting with Heckstall and that he was in possession of a loaded firearm at that time, which he took with him when he left her residence with defendant early the next morning. Her recollection of the handgun and ammunition in Heckstall's possession was consistent with the medical examiner's report of the gunshot wound that caused the victim's death.
Several witnesses testified that they also saw defendant and Heckstall traveling together in a gray or dark SUV the morning of the shooting. A vehicle consistent with this description was also seen parked with its lights on near the location of the murder, only to later depart when a man entered the passenger side at about the same time as the shooter was seen fleeing the murder scene. Ample records were produced indicating that defendant had rented a similar SUV in Albany a few days before the murder and then returned it at night on the day of the murder. Moreover, when Heckstall appeared at a family member's home in Brooklyn in the afternoon following the shooting, one witness noted that he was in possession of a significant amount of money and another testified that Heckstall had arrived in Brooklyn in a gray SUV. Notably, defendant logged roughly 640 miles on the SUV that he rented.
As to how the victim was lured to the murder location, his mother recalled that her son, a self-employed contractor, received a call the night before the murder to set up an in-person meeting early the following morning, purportedly to discuss a potential construction job. Significantly, telephone records admitted into evidence revealed that a cell phone registered to defendant's residence also called the victim's cell phone that night, apparently by mistake, as the call lasted only two seconds. Subsequently, there were several calls to the victim from a TracFone with no subscriber information. A search of defendant's computer indicated that, in the time preceding the murder, several online searches were made regarding real property in the area, including the meeting location provided to the victim during that phone call. As to the defense's proffered explanation that he may have conducted such Internet searches as part of a college class assignment, witness testimony clarified that the associated assignment had been due in October, more than a month prior to the victim's death.
Ample evidence was put forth to show defendant's motive, planning and facilitation of the victim's murder. Specifically, the evidence demonstrated that Heckstall possessed a gun consistent with the murder weapon immediately [*4]prior to the shooting, that Heckstall was identified as the shooter, that defendant interacted with Heckstall around the time and in the vicinity of the murder, and that defendant rented a vehicle that was consistent with one seen in the vicinity and at the time of the shooting. Moreover, defendant's phone and computer records indicated that he had called the victim the evening prior to the murder and had previously researched the shooting location. The proof also demonstrated that defendant's drug trial was impending and that the victim was expected to testify in defendant's prosecution. "[V]iewing the evidence in a neutral light and weighing the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn therefrom" (People v Oquendo, 248 AD3d 1325, 1333 [3d Dept 2026] [internal quotation marks, brackets and citations omitted]; see People v Rickett, 244 AD3d 1284, 1287 [3d Dept 2025], lv denied 45 NY3d 938 [2026]), we are satisfied that "the inference of guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence" (People v Baque, 43 NY3d 26, 30 [2024] [internal quotation marks and citation omitted]; accord People Cipriani, 244 AD3d 1304, 1306 [3d Dept 2025], lv denied 44 NY3d 1065 [2026]; People v Noble, 244 AD3d 1499, 1505 [3d Dept 2025]). Accordingly, the verdict in defendant's first trial finding him guilty of murder in the first degree was not against the weight of the evidence.
Although a fundamental defect rendered defendant's first trial invalid (see People v Hoffler, 53 AD3d at 123; Hoffler v Bezio, 726 F3d at 156), because the evidence presented therein was legally sufficient, and as the verdict was not against the weight of the evidence, defendant's retrial was not barred by principles of double jeopardy (see CPL 40.30, 470.20 [5]; People v Scerbo, 74 AD3d 1730, 1731-1733 [4th Dept 2010], lv denied 15 NY3d 757 [2010]; see generally Burks v United States, 437 US 1, 18 [1978]; Hoffler v Bezio, 726 F3d at 159-160; Matter of Suarez v Byrne, 10 NY3d 523, 534 [2008]; People v Banks, 152 AD3d 816, 818 [3d Dept 2017]; see also People v Rivera, 111 AD3d 1280, 1281 [4th Dept 2013], lv denied 22 NY3d 1090 [2014]).
Turning to defendant's challenges related to his retrial, we first address his legal sufficiency and weight of the evidence contentions. The People largely relied upon the same evidence at retrial as that adduced in defendant's first trial with, however, certain additional proof. Most notably, further testimony was elicited clarifying that, in relation to the underlying drug prosecution, defendant would have been made aware of the dates, locations and other identifying details of the subject transactions involving the victim. Other witness testimony, amplified by the use of a photograph of Heckstall, again identified him as the shooter and as the individual who [*5]had been seen with defendant in a dark-colored or gray SUV prior to the murder. In view of our conclusions as to the sufficiency and weight of the evidence presented at defendant's first trial, and as the evidence at retrial echoed that of the first with the benefit of additional testimony supporting the People's theory of guilt, we similarly find that defendant's conviction after retrial is supported by legally sufficient evidence and is not against the weight of the evidence (see People v Baque, 43 NY3d at 30; People v Oquendo, 248 AD3d at 1333; People v Noble, 244 AD3d at 1505; People Cipriani, 244 AD3d at 1306; People v Rickett, 244 AD3d at 1287).
We are similarly unpersuaded by defendant's ineffective assistance of counsel claim based upon his counsel's alleged failure at retrial to object to the use of his street name "Murder" and by his reference to that name in his closing statement. The record reflects that defendant unsuccessfully moved prior to his first trial to strike the alias from the indictment, to make no mention of same during jury selection, or to limit its use at trial. In this regard, on appeal from his first trial, this Court found "no fault" in County Court's pretrial rulings (People v Hoffler, 53 AD3d at 118) and also found testimony regarding defendant's alias permissible in his drug trial insofar as it was "highly probative in identifying him as the perpetrator" (People v Hoffler, 41 AD3d 891, 892 [3d Dept 2007], lv denied 9 NY3d 962 [2007]). Notably, defendant's alias was likewise significant to his identification at retrial, as several witnesses knew him only by that name. Under these circumstances, defense counsel did not again seek to limit the use of defendant's alias, despite County Court twice offering to provide a limiting instruction to the effect that the alias could be used for identification purposes only. Instead, defense counsel stated that it was his intention to elicit testimony that the alias was purportedly the music-related acronym "M.U.R.D.A." Although such testimony was ultimately not offered, the record suggests that defense counsel did attempt to address any potential prejudice during his closing statement by attacking the People's efforts to characterize defendant as a "bad guy," with reference to his street name and the solely circumstantial nature of the case.
As there was little reason for defense counsel to believe that a motion to preclude reference to defendant's alias at retrial would be successful, his failure to make such motion does not constitute ineffective assistance (see People v Chappell, 198 AD3d 1018, 1020-1021 [3d Dept 2021], lv denied 37 NY3d 1160 [2022]; People v Valentin, 173 AD3d 1436, 1440 [3d Dept 2019], lv denied 34 NY3d 954 [2019]). Defense counsel's reference to defendant's alias at closing similarly presented a reasonable strategy to attack the strength of the People's case (see People v Clark, 244 AD3d 1613, 1616 [3d Dept 2025]; People v Chappell, 198 AD3d at 1021). [*6]In any event, "evaluating the totality of counsel's representation, considering whether counsel made appropriate motions, set forth a cogent defense theory, interjected viable objections, conducted meaningful cross-examination, gave an effective summation and otherwise presented a zealous defense, we cannot conclude that defendant was deprived of meaningful representation" (People v Njoku, 218 AD3d 1047, 1053 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 40 NY3d 1093 [2024]).
Next, defendant's challenge to the integrity of the grand jury proceeding — based upon certain proffered testimony — does not require lengthy discussion inasmuch as it has already been addressed and rejected by this Court on his appeal from his initial conviction (see People v Hoffler, 53 AD3d at 118; see also People v Willette, 73 AD3d 1278, 1279 [3d Dept 2010], lv denied 16 NY3d 746 [2011]). To the extent that defendant's argument in this regard on the instant appeal varies from that of his earlier appeal, his challenge to the legal sufficiency of the grand jury evidence is precluded by our finding that the evidence supporting defendant's ultimate conviction is legally sufficient (see CPL 210.30 [6]; People v Sutton, 174 AD3d 1052, 1054 [3d Dept 2019], lv denied 34 NY3d 954 [2019]). In any event, even absent the challenged testimony, the evidence presented before the grand jury was legally sufficient to sustain the indictment (see generally People v Reid, 185 AD3d 1163, 1164-1165 [3d Dept 2020]).
Finally, we are unpersuaded by defendant's challenge to the severity of his sentence. As emphasized by our dissenting colleague, defendant's prison records reflect his laudable academic achievements, numerous accolades, and notable mentorship roles while incarcerated. We likewise acknowledge defendant's arguably youthful age of 24 years at the time of the murder, as well as the significant challenges and hardships that he faced as a child. Nevertheless, and significantly, the record evidence here makes clear that the victim's murder was not the result of a sudden act of violence borne out of youth, inexperience or trauma. Instead, defendant carefully orchestrated the victim's assassination as a mechanism to avoid responsibility for his most recent criminal activities — the underlying drug-related crimes being a reflection of defendant's already lengthy criminal history at that time. Moreover, despite defendant's emphasis on his later academic achievements, he was apparently enrolled in college courses at the time of the murder. It bears further noting that defendant's positive prison records, while extensive, are far removed from the time of his conviction and are only now available for review because of the unique procedural history of this case. In point of fact, this Court affirmed the convictions of both of the other perpetrators involved in the victim's murder — who received like sentences — without them having had the unique benefit of demonstrating [*7]any self-improvements made over the course of more than a decade of incarceration (see People v Booker, 53 AD3d 697, 698, 704 [3d Dept 2008], lv denied 11 NY3d 853 [2008]; People v Heckstall, 45 AD3d 907, 908 [3d Dept 2007], lv denied 10 NY3d 766 [2008]).
Although we agree with the dissent as to the gravity and finality of defendant's sentence of life imprisonment without the possibility of parole, that sentence is expressly authorized for serious crimes such as the one committed here. That is not to say that we necessarily disagree with many of the policy considerations raised in the dissent on this issue, as there exist strong arguments in favor of legislative action to address the potential for a concrete mechanism for resentencing in appropriate circumstances, including sentences of life without parole. The Legislature has yet to take such action.FN4 In any event, and in view of the heinous and calculated nature of defendant's crime, we do not find the sentence imposed to be unduly harsh or severe and we decline to modify the otherwise lawful sentence as a matter of discretion in the interest of justice (see CPL 470.15 [3] [c]; [6] [b]; People v Burton, 215 AD3d 1054, 1064 [3d Dept 2023], lv denied 40 NY3d 927 [2023]; People v Mattis, 108 AD3d 872, 876 [3d Dept 2013], lv denied 22 NY3d 957 [2013]; People v Caruso, 34 AD3d 863, 865 [3d Dept 2006], lv denied 8 NY3d 879 [2007]).
Fisher, Powers and Ryba, JJ., concur.
Garry, P.J. (concurring in part and dissenting in part).
Life imprisonment without parole is unique in its finality. It is a determination that the offense not only warrants severe punishment, but that the offender is fully, completely and forever beyond any possibility of redemption. That determination is made at sentencing, which may be long before an individual's character has fully developed or stabilized. In my view, defendant's demonstrated rehabilitation while incarcerated, coupled with advances in neuroscience and sentencing policy, substantially undermine confidence in the continued necessity of foreclosing the possibility of his future release. I therefore respectfully dissent, solely as to that part of the decision affirming the sentence imposed.
There can be no dispute concerning the gravity and cruelty of the crimes committed here. The record reflects that defendant orchestrated the calculated murder of a witness willing to contribute to his community, and society at large, by testifying to combat defendant's narcotics activity. Defendant's deeply self-interested conduct senselessly extinguished a human life, irreversibly devastated a family and damaged public confidence in the administration of justice. The extraordinary callousness of defendant's actions and the profound and enduring grief he inflicted understandably resulted in a lawful sentence of life imprisonment without parole, both when first imposed in 2005 (53 AD3d 116 [3d Dept 2008], lv denied 11 NY3d 832 [2008]) and upon retrial in 2016. The unusual posture [*8]of this retried case permits consideration of circumstances that ordinarily would not be available on direct appeal — to wit, over 20 years of documented behavior while incarcerated. Based upon representations by appellate counsel in connection with his challenge to the severity of defendant's sentence, this Court requested and obtained records to substantiate defendant's claims of rehabilitation (see generally People v Chen, 176 AD2d 628, 628 [1st Dept 1991]). We further authorized the People to obtain and submit defendant's prison disciplinary history in response. Before turning to those submissions, some context is warranted as to what has changed, other than defendant's character, since his severe sentence was first imposed more than two decades ago.
Although a legal adult, defendant had just turned 24 years old when he committed the subject offense in 2003. It was around that time when our society began to more widely recognize that, as compared to adults, juveniles are far more impetuous, lacking in both maturity and a sense of responsibility, that they are more susceptible to negative influences, and that their characters are not as well formed (see Roper v Simmons, 543 US 551, 569 [2005]). Those "salient characteristics" (Graham v Florida, 560 US 48, 68 [2010]) of youth have been found to make it "difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption" (Roper v Simmons, 543 US at 573). Thus, courts began to hold that "juvenile offenders cannot with reliability be classified among the worst offenders" deserving of the "most severe punishment[s]" (id. at 568, 569 [concerning the death penalty]; see Miller v Alabama,567 US 460, 465 [2012] [concerning mandatory life imprisonment schemes]; Graham v Florida, 560 US at 68 [concerning life imprisonment without parole for nonhomicide crimes]). These hallmark characteristics of youth not only weaken typical penological justifications for harsh punishment, they amplify capacity for reform (see Miller v Alabama,567 US at 471-473).
The wisdom "that youth matters in sentencing" does not suddenly lose force upon a person's 18th birthday (Jones v Mississippi, 593 US 98, 105 [2021]; see Roper v Simmons, 543 US at 574). Indeed, in more recent years, neuroscience, criminology and our standards of decency — all captured by sentencing policy — have markedly evolved. Subsequent research shows that development of the regions of the brain responsible for impulse control, executive functioning, emotional regulation and risk assessment continues well into an individual's twenties, irrespective of any rigid legal boundary we have, up until now, generally agreed to as a society (see e.g. Francis X. Shen et al., Justice for Emerging Adults After Jones: The Rapidly Developing Use of Neuroscience to Extend Eighth Amendment Miller Protections to Defendants [*9]Ages 18 and Older, 97 NYU L Rev Online 101, 104-107 [May 2022]; Elizabeth S. Scott et al., Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy, 85 Fordham L Rev 641, 645-656 [Nov. 2016]; Alexandra O. Cohen et al., When Does a Juvenile Become an Adult? Implications for Law and Policy, 88 Temp L Rev 769, 785-787 [2016]; Vincent Schiraldi et al., Community-Based Responses to Justice-Involved Young Adults, New Thinking in Community Corrections, US Department of Justice, National Institute of Justice at 3-8 [Sept. 2015], available at https://nij.ojp.gov/library/publications/
community-based-responses-justice-involved-young-adults [last accessed June 2, 2026]). Interestingly, some research suggests that individuals up to the age of 24 or 25 engage in even greater risk-taking behavior compared to those under the age of 18 — an occurrence occasioned by comparable neurological underdevelopment paired with more complicated social expectations and greater independence (see Scott at 649-650; Cohen at 785-787; Schiraldi at 4). These developments have increasingly informed sentencing policy nationwide (see The Sentencing Project, Left to Die in Prison: Emerging Adults 25 and Younger Sentenced to Life without Parole at 10-12[June 2023], available at https://www.sentencingproject.org/app/uploads/2023/09/Left-to-Die-in-Prison-Emerging-Adults-25-and-Younger-Sentenced.pdf [last accessed June 2, 2026]), and some courts have already begun to take a more protective stance toward new classes of "emerging adult" or "young adult" offenders (see e.g. Commonwealth v Mattis, 493 Mass 216, 217-218, 225-229 [2024] [extending the state's prohibition against life imprisonment without parole for offenders under the age of 18 years old to those who were 20 years of age or younger when they committed their crime(s)]).
In New York, similar concerns have been reflected in repeated legislative proposals to provide courts with the opportunity to take a "second look" at lengthy prison sentences (see e.g. 2025 NY Senate Bill S158, 2025 NY Assembly Bill A1283; 2023 NY Senate Bill S321, 2023 NY Assembly Bill A531; 2021 NY Senate Bill S7872, 2021 NY Assembly Bill A8894). Although varying somewhat by session, these proposals generally would permit resentencing after an individual has served a substantial period of their term of incarceration and demonstrated rehabilitation, while continuing to afford victims, prosecutors and the court an opportunity to be heard regarding public safety and the interests of justice. The most recent proposal, presently active before the Legislature, authorizes reductions that may well be below the applicable statutory minimum and would create certain rebuttable presumptions in favor of resentencing, including where an otherwise qualified applicant was 25 years of age or younger on the date of his or her incarcerating offense (see 2025 NY Senate Bill S158, 2025 NY Assembly Bill A1283). No offenses, or sentences, would [*10]be excluded (see 2025 NY Senate Bill S158, 2025 NY Assembly Bill A1283). Although such legislation has not yet been enacted, its repeated introduction reflects a growing recognition that the propriety of continued incarceration may be informed not only by the facts known at sentencing, but also "new laws, scientific research, and norms" and "the profound rehabilitative work in which many individuals engage while incarcerated" (Senate Introducer's Mem in Support of 2025 NY Senate Bill S158; see generally New York State Justice Task Force, Recommendations on Second Look Sentencing Reform, available at https://www.nyjusticetaskforce.org/pdfs/
Recommendations-on-Second-Look-Sentencing-Reform.pdf [last accessed June 2, 2026]).
It is also worth emphasizing that there are practical institutional consequences inherent to sentences of life imprisonment without parole. Individuals who have no prospect of parole have little incentive to participate in programming or invest in self-improvement, but they also have almost no reason to comply with institutional rules. The absence of hope of release thus removes one of the most powerful behavioral tools available to correctional administrators to ensure staff safety and institutional stability. By contrast, even a distant conditional opportunity for release encourages compliance with correctional objectives. The foregoing serves to underscore the exceptional nature of a sentence that permanently forecloses any future consideration of whether an individual has in fact changed. Put differently, life imprisonment without parole requires a prediction that no future reform will ever warrant reconsideration. Here, however, this Court has the rare opportunity to evaluate that prediction.
Turning back to defendant, the record reveals that defendant's upbringing was marked by instability, loss and trauma. Defendant's father abandoned the family when defendant was 4 or 5 years old, and, at the age of 10, he learned of the father's death by apparent overdose. Defendant's mother was also drug addicted and died from similar circumstances roughly one year later. Defendant lived with a family member for a short while thereafter before venturing out on his own, and he ultimately began using drugs daily by the age of 14. He was kicked out of high school in the 11th grade for a variety of behavioral problems, and, by 19, he became involved in a violent gang. Although none of those circumstances excuse the horrific conduct at issue here, or defendant's significant prior criminal history considered by the sentencing court (all drug related), such factors remain relevant in assessing maturity, culpability and rehabilitative potential.
The uncontested evidence before this Court of defendant's rehabilitation while incarcerated is simply remarkable. Over the course of more than two decades in prison, defendant has not merely completed recommended programming, he has shown a sustained commitment to education, self-improvement and the [*11]service of others. Defendant first addressed the issues that contributed to his criminal conduct through extensive therapeutic and rehabilitative programming, completing Residential Substance Abuse Treatment, Alcohol and Substance Abuse Treatment, Narcotics Anonymous, Anger Regression Treatment and Alternatives to Violence programming. He also pursued opportunities for higher education, with exceptional success. While incarcerated, he graduated from Cayuga Community College with a 3.94 grade point average, earning an Associate's degree and distinction as salutatorian of the Cornell Prison Education Program. He subsequently earned both an Associate's degree and a Bachelor's degree in behavioral science from Mercy College, graduating summa cum laude and serving as valedictorian of his graduating class with respect to the latter. Defendant later obtained a Master of Professional Studies degree from New York Theological Seminary. These accomplishments earned him a Certificate of Merit from the New York State Assembly. Defendant has also translated those educational achievements into meaningful service. He obtained state certifications as a teacher's aide and counselor's aide, completed legal research training and presently serves as a law library clerk and paralegal. Institutional staff have described him as "instrumental" to the operation of the law library, particularly during the COVID-19 pandemic, and he is credited with assisting countless incarcerated individuals in accessing legal and educational resources.
The submissions reflect a further myriad of ways in which defendant has made it his purpose to assist others. He has completed a variety of peer counseling and restorative justice programs, ultimately assuming several leadership roles responsible for assisting fellow incarcerated individuals with a number of personal challenges. Defendant has mentored younger incarcerated individuals, tutored fellow students and helped persons struggling with mental illness, substance abuse and gang affiliation. Multiple letters credit defendant with encouraging accountability, personal responsibility and positive life changes in those around him. Several submissions notably recount defendant's intervention in an apparent suicide attempt, describing actions that may well have saved another person's life. Defendant has also participated in real-world, community-based programs aimed at reducing gun violence, supporting disadvantaged schoolchildren and even raising service animals for wounded veterans/first responders or to assist law enforcement.
Perhaps most telling is the consistency with which correction officers, counselors and institutional staff describe defendant's character and conduct. Their letters repeatedly commend defendant's maturity, leadership and commitment to service. Those submissions collectively portray an individual who has spent years attempting to accept responsibility for his past conduct by improving himself and encouraging others to [*12]do the same. Particularly compelling is the commendation authored by the current Commissioner of Corrections and Community Supervision, in which the Commissioner recognized defendant's accomplishments and positive contributions within the correctional system while thanking him for "doing [his] part to spread the message of transformation to the [incarcerated] population with [his] actions." That assessment, coming from the official charged with overseeing New York's correctional institutions, powerfully encapsulates what the submissions before us reveal: defendant has undergone a genuine and sustained transformation since the time his sentence of life imprisonment without parole was imposed. Despite the challenges of incarceration, defendant has become a contributing member of society.
Defendant's institutional history is not unblemished. The disciplinary record supplied by the People reflects violations involving narcotics possession, unauthorized exchanges and institutional disturbances. Those matters are serious and properly considered. However, that record further reflects that the most recent disciplinary incidents occurred over a decade ago, after which defendant appears to have maintained institutional stability, while engaging in sustained educational, vocational and rehabilitative efforts. On the whole, the submissions before us demonstrate meaningful maturation and rehabilitation.
I recognize that defendant's codefendants, who effectuated the victim's death only upon defendant's direction, also received sentences of life imprisonment without parole (People v Booker, 53 AD3d 697, 698-699 [3d Dept 2008], lv denied 11 NY3d 853 [2008]; People v Heckstall, 45 AD3d 907, 910 [3d Dept 2007], lv denied 10 NY3d 766 [2008]) — sentences that, to the extent challenged, were upheld by this Court (People v Booker, 53 AD3d at 704). I am also sensitive to the fact that, ironically, the uncharacteristic delay associated with not only defendant's retrial but this second direct appeal now places him in the beneficial position of being able to present decades of rehabilitative evidence relevant to our interest-of-justice review. In my view, that posture does not preclude the exercise of our discretionary authority (see CPL 470.15 [6] [b]; 470.20 [6]; see generally People v Brisman, 43 NY3d 322, 325-328 [2025]; People v Chen, 176 AD2d at 628).
Most importantly, I do not overlook the extraordinary loss suffered by the victim's family. The powerful impact statement provided by the victim's mother is a sobering reminder that this case is by no means about defendant alone. It is also about a son who never returned home and a family forced to carry that loss for more than two decades, and forevermore. The passage of time has afforded defendant opportunities for growth and rehabilitation; it has afforded the victim's family no comparable relief. My conclusion should not be understood as minimizing that suffering, nor suggesting that defendant has earned release.[*13]
"[S]ociety derives no legitimate benefit from imprisoning a person for longer than is warranted" (People v Brisman, 43 NY3d at 331), and, in my view, the continued permanent denial of any possibility of defendant being paroled is no longer warranted. I would therefore modify the judgment, as a matter of discretion in the interest of justice, by reducing the sentence imposed upon defendant's conviction of murder in the first degree from life imprisonment without parole to an indeterminate sentence of 25 years to life imprisonment (see Penal Law § 70.00 [1], [2] [a]; [3] [a] [i] [A]), which would continue to run consecutively to the lengthy sentence defendant received for the underlying narcotics crimes.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1
Heckstall was convicted following a jury trial of two counts of murder in the first degree and conspiracy in the second degree; this Court affirmed the conviction on Heckstall's direct appeal (People v Heckstall, 45 AD3d 907 [3d Dept 2007], lv denied 10 NY3d 766 [2008]; see also Matter of Heckstall v McGrath, 15 AD3d 824 [3d Dept 2005]).

Footnote 2
Another individual, Lance Booker, was also convicted following a jury trial of two counts of murder in the first degree and conspiracy in the second degree for his role in the victim's death, which conviction this Court affirmed (People v Booker, 53 AD3d 697 [3d Dept 2008], lv denied 11 NY3d 853 [2008]).

Footnote 3
Defendant was also charged with an additional count of first-degree murder and with conspiracy in the second degree, both of which were later dismissed.

Footnote 4
Defendant is not, however, without remedy as his later achievements may appropriately be considered in the context of an application for executive clemency. Far beyond the limited information available to us upon this record, it is through the executive clemency process that a thorough review of an incarcerated person's prison records, mental and physical health records, among other pertinent documentation, may be made in considering the commutation of a sentence.